277 Neb. 391
JEFFREY JAY REED, APPELLEE,
v.
CHRISTINE JENNIFER REED, APPELLANT.
No. S-06-757.
Supreme Court of Nebraska.
Filed March 20, 2009.
John W. Ballew, Jr., and Jennifer L. Tricker, of Ballew Covalt, P.C., L.L.O., for appellant.
Mark Porto, of Shamberg, Wolf, McDermott & Depue, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.
Christine Jennifer Reed and Jeffrey Jay Reed's marriage was dissolved by the district court, but the court rejected Christine's claims that Jeffrey's predivorce transfers of certain business assets were fraudulent. The primary issues in this appeal are whether the transferees of disputed transfers are necessary parties to an action brought under Nebraska's Uniform Fraudulent Transfer Act (UFTA),[1] and whether Christine can obtain equitable relief for the alleged dissipation of marital assets. For the reasons that follow, we conclude that the absence of necessary parties precluded Christine from proceeding under the UFTA and that Christine has not shown that Jeffrey dissipated marital assets. Therefore, we affirm the district court's judgment.

BACKGROUND
In 1997, Christine and Jeffrey formed C.J. Reed Enterprises, Inc. (C.J. Reed), to purchase and operate a jewelry store. Christine and Jeffrey obtained bank financing, and Jeffrey's parents, James and Precious Reed, agreed to act as sureties on the loan. On July 11, 1997, Christine, Jeffrey, James, and Precious executed an agreement setting forth each party's rights and obligations. At the time, Christine and Jeffrey each owned one-half the shares of C.J. Reed stock. The agreement specified that James and Precious could take title to all of C.J. Reed's stock if Christine or Jeffrey failed to discharge her or his obligations as owners of C.J. Reed to the satisfaction of James and Precious. Among other things, the agreement required Christine and Jeffrey to avoid "default" in making "payment to trade creditors or any other creditors."
In 2000, James and Precious paid Christine and Jeffrey's bank debt and became the sole financiers of the business. The principal on Christine and Jeffrey's loan was $576,595.92, and interest was calculated at $188,163, assuming the loan was paid within 10 years. Between May 2001 and the time of the divorce proceeding, Christine and Jeffrey paid $3,000 toward the principal and $40,000 toward the interest. Christine and Jeffrey each concede that this constituted a "default" within the meaning of the July 1997 agreement with James and Precious.
In January 2004, Jeffrey formed R.S. Wheel, L.L.C., with Dr. Steven Schneider. R.S. Wheel spent $380,000 (or between $3 and $4 a square foot) to purchase a former motel property in Grand Island, Nebraska, across the street from a location where Wal-Mart planned to open a store. The hope was that the land could be resold for a profit due to its location. R.S. Wheel obtained bank financing for the purchase and, at the time of trial, owed $383,842.70 on the loan.
Jeffrey informed James in early June 2004 of his intent to divorce Christine, and James evidently informed Jeffrey that if Jeffrey was going to divorce Christine, James and Precious were going to take the jewelry store. So, on June 11, James and Precious notified their attorney that they wanted to exercise their option to take title of C.J. Reed. On June 15, Christine and Jeffrey were sent letters informing them that James and Precious were transferring all the shares of C.J. Reed stock to themselves. An appraiser, hired by Christine, opined that on March 31, 2004, based on the income of the business, the stock was worth between $164,900 and $178,700. But it is unclear from the record and testimony whether that valuation accounted for the debt to James and Precious, and it appears that it did not. James and Precious later sold the business, but were unable to sell if for enough money to cover the outstanding debt.
Jeffrey also discussed his plans to divorce Christine with Schneider. Schneider said that because of the divorce, Jeffrey was unsure of his future cashflow or ability to assist in making payments on R.S. Wheel's debt. Jeffrey also suggested that R.S. Wheel might be unable to sell or develop the property because of the imminent divorce proceedings. Jeffrey suggested that Schneider find another partner or buy Jeffrey out. Schneider agreed to buy Jeffrey out, and on June 18, 2004, Jeffrey transferred his interest in R.S. Wheel to Schneider. In return, on June 21, Jeffrey received a check for $15,000.
Jeffrey filed for divorce on June 24, 2004. Christine answered Jeffrey's complaint and counterclaimed for dissolution. Christine's operative counterclaim alleged that the transfer of C.J. Reed stock and the sale of Jeffrey's interest in R.S. Wheel were fraudulent transfers within the meaning of the UFTA. Christine prayed that the court "make a determination as to whether a fraudulent conveyance of real and/or personal property has occurred immediately prior to the filing of this divorce, whether the marital estate was dissipated as a result thereof and enter such equitable relief as may be appropriate." It should be noted the record contains no indication that James, Precious, or Schneider were made parties to or formally notified of the fraudulent transfer claim or that either Christine or Jeffrey sought to implead James, Precious, or Schneider, or provide them with formal notice.
On July 26, 2004, Schneider and Jeffrey, who is employed as a real estate broker, entered into an "Exclusive Listing Agreement" for Jeffrey to list R.S. Wheel's property for sale at a price of $925,000. Jeffrey was to receive a 5-percent commission of the gross sale price for his work in selling the property. But at the time of trial, the property had not been sold. Jeffrey testified that the property had been listed at $6 to $8 per square foot and might be worth that once it was developed. But Jeffrey also testified that R.S. Wheel has "paid $3 to $4 a square foot for [the property]; that's what it's worth." Jeffrey and Schneider both testified that the price on the listing was high so it would be easier to negotiate with potential buyers by lowering the price.
In addition, a temporary child support and spousal support order was entered on December 1, 2004, although the amount Jeffrey was to pay each month was reduced in an order filed March 15, 2005. On December 12, Christine filed a motion for an order to show cause why Jeffrey should not be held in contempt of court, alleging a total arrearage of $9,544.72.
The district court deferred ruling on the contempt issue until after a trial on all issues had been completed. In its decree, the court awarded sole legal and physical custody of the parties' children to Christine and entered permanent awards of child support and alimony. The court dismissed the contempt action, reasoning that the "orders for child support and alimony under [the] Decree are less than the temporary orders and [Jeffrey] now has greater resources available to pay on arrearages." The court also rejected Christine's arguments with respect to fraudulent transfers. The court reasoned, with respect to C.J. Reed, that Christine and Jeffrey were in default on their payments to James and Precious, giving James and Precious the right to transfer the C.J. Reed stock. The court concluded that "[t]he transfer of stock to James and Precious Reed was not a fraudulent conveyance, but rather a transfer of secured property pursuant to [the financing agreement]."
With respect to R.S. Wheel, the court reasoned that "the parties were not in good financial shape" at the time of the sale and that a divorce was certain to bring additional expenses in the form of child support and alimony. Jeffrey had testified that he would have been unable to service his portion of R.S. Wheel's debt. Thus, the court concluded that "the sale of Jeffrey's interest [in R.S. Wheel] to Dr. Schneider was for legitimate financial reasons and was not a fraudulent transfer as alleged by Christine."
Christine appealed, and we affirmed the judgment.[2] Christine filed a motion for rehearing, which we sustained. We now withdraw our original opinion, for the reasons explained below, and substitute this opinion affirming the judgment.

ASSIGNMENTS OF ERROR
In her appellate brief, Christine assigns that the district court erred in failing to (1) find that the transfer of Jeffrey's interest in R.S. Wheel was a fraudulent transfer in violation of the UFTA, (2) find that the transfer of Jeffrey's interest in C.J. Reed was a fraudulent transfer in violation of the UFTA, (3) set aside the transfers of Jeffrey's interest in R.S. Wheel and C.J. Reed for the purposes of determining the value of the marital estate and dividing it equitably, and (4) include the value of the fraudulent transfers in the marital estate and distribute the value equitably between the parties.
In addition, in our order sustaining Christine's motion for rehearing, we directed the parties to brief (1) whether the public policy of the UFTA would be served by applying its provisions to the transfer of alleged marital assets and (2) whether the trial court's jurisdiction to consider Christine's fraudulent transfer claims was affected by the absence of necessary parties.

STANDARD OF REVIEW
[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.[3]
[2] A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.[4]

ANALYSIS

UFTA
In our initial decision in this appeal, we held that a former spouse's right to an equitable division of the marital estate is not a "'right to payment'" under the UFTA and that thus, a former spouse does not qualify as a "'creditor'" under the UFTA by virtue of his or her right to an equitable share of the marital estate.[5] We stated that Christine's status as a child support creditor did not confer status as a creditor for purposes of restoring fraudulently transferred assets to the marital estate. As a result, we concluded that the UFTA did not apply to Christine's claims that the predivorce transfers of Jeffrey's business interests should be set aside as fraudulent.[6] Thus, we affirmed the district court's judgment.
But in reaching that conclusion, we failed to note relevant authority from other jurisdictions holding that a former spouse may obtain relief from a fraudulent transfer intended to defeat equitable distribution of the marital estate,[7] including authority specifically arising under those jurisdictions' versions of the UFTA[8] or its functionally similar predecessor, the Uniform Fraudulent Conveyance Act.[9] While many of those courts have not found it necessary to discuss the "creditor" status of the spouse, others have specifically held that the spouse is a "creditor" within the meaning of the relevant statute.[10] This is significant because § 36-712 requires that the UFTA "be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the act among states enacting it." In addition, we did not consider the broad prayer for relief in Christine's operative counterclaim, which could encompass enforcement of the past-due child support award. And we have held that a child support creditor may use the UFTA to pursue transferred assets that are needed to satisfy a child support award.[11]
In the end, however, we need not decide the extent to which the UFTA is applicable to the equitable division of marital property. In this case, as suggested by our briefing order on reargument, application of the UFTA was precluded by the failure to join necessary parties.
[3-5] An indispensible or necessary party is one whose interest in the subject matter of the controversy is such that the controversy cannot be finally adjudicated without affecting the necessary party's interest or which is such that not to address the interest of the necessary party would leave the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience.[12] A court may determine any controversy between parties before it when it can be done without prejudice to the rights of others or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in.[13] The presence of necessary parties is jurisdictional, and the absence of necessary parties deprives the district court of jurisdiction.[14]
[6-8] An action under the UFTA is equitable in nature,[15] and all persons whose rights will be directly affected by a decree in equity must be joined as parties in order that complete justice may be done and that there may be a final determination of the rights of all parties interested in the subject matter of the controversy.[16] Specifically, all persons interested in the contract or property involved in the suit, or whose interests therein may be affected by the decree in equity, are necessary parties.[17] Thus, we held at common law that "'in all actions brought by creditors to subject property which it is claimed was fraudulently transferred, . . . [t]he person to whom the property has been transferred is . . . a necessary party.'"[18] That generally reflects the law under the UFTA,[19] and in marital dissolution actions.[20]
Of course, the problem in this case is that Christine's fraudulent transfer claims implicate the interests of James, Precious, and Schneider, who ended up with the assets that Christine claims were fraudulently transferred. Because those interests would be affected if the transfers were set aside or the assets attached, James, Precious, and Schneider were necessary parties to that extent.
[9] But Christine's counsel asserted, at oral argument on rehearing, that Christine was not seeking to have the transfers set aside; rather, she had only sought to have the value of the transferred assets included in the marital estate for purposes of equitable division. It has been held that if an action is brought for wrongful transfer and it is possible to fashion relief which does not adversely affect the transferee's interest, then the transferee may not need to be joined in an action for judgment of damages against a defendant.[21] And we have held that the determination of one of the parties to a marriage to place property beyond the reach of the other party, and thus forestall a division of the property, does not operate to deprive the district court of jurisdiction to determine an equitable division of those assetsi.e., to award the value of a share of the disputed assets.[22]
Jeffrey's counsel contended, at oral argument on rehearing, that Christine's waiver of any remedy other than equitable credit had not been clear before the rehearing was sustained and that our briefing order raised the issue of necessary parties. We are inclined to agree, but accept Christine's concession at face value. Given that concession, the question at this point is whether Christine is making a claim under the UFTA at all.
The UFTA is simply the latest in a line of statutes dating back to the reign of Elizabeth I[23] that declares rights and provides remedies for unsecured creditors against transfers that impede the collection of claims.[24] In other words, the purpose of the UFTA is to provide creditors with a means to satisfy debts using assets that have been fraudulently transferred.[25] But Christine has waived any interest in pursuing the disputed assets. As a result, Christine is not seeking any remedy that is not available to her in a dissolution action as an alleged dissipation of marital assets.[26] And we read Christine's operative counterclaim, and her appellate argument, to articulate a claim for equitable relief under that doctrine.
Christine notes that the UFTA permits a creditor to obtain, "subject to applicable principles of equity," "any other relief the circumstances may require."[27] But under these circumstances, the "applicable principles of equity" are the well-established equitable principles applicable to valuation and division of the marital estateincluding the doctrine of dissipation, which provides the relief that Christine is requesting.
We have said that where all the parties necessary to a proper and complete determination of an equity cause were not before the court, an appellate court may remand the cause for the purpose of having such parties brought in.[28] But there is no reason to do so here, because Christine has, in effect, waived her UFTA claim in favor of a claim for dissipation of marital assets. James, Precious, and Schneider are not necessary parties to such a claim.[29]
To summarize: To the extent that Christine sought to set aside the disputed transfers, the trial court lacked jurisdiction because of Christine's failure to join necessary parties. But Christine now disclaims any interest in setting aside the transfers. So her claim is best characterized as a claim for dissipation of marital assets, which she also presented, and which requires only Christine and Jeffrey as parties. We need not further consider the UFTA or Christine's first two assignments of error. Instead, we consider Christine's arguments and her third and fourth assignments of error in the context of dissipation of marital assets, discussed below. We note, however, that much of our reasoning below would also have been relevant under the UFTA.

DISSIPATION OF MARITAL ASSETS
[10-12] As a general rule, all property accumulated and acquired by either spouse during a marriage is part of the marital estate.[30] We have explained that "[dissipation of marital assets" is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown.[31] As a remedy, we have held that marital assets dissipated by a spouse for purposes unrelated to the marriage should be included in the marital estate in dissolution actions.[32]
It is apparent that the disputed transfers in this case took place at the time when the marriage was undergoing an irretrievable breakdown, as both transfers took place specifically because Jeffrey intended to file for divorce. The record establishes that Jeffrey's interest in R.S. Wheel and the parties' interest in C.J. Reed were marital assets. And we assume, for purposes of this analysis, that disposing of marital assets for less than fair market value, in an alleged attempt to shield the assets from equitable distribution, would represent their use for a selfish purpose unrelated to the marriage.
But in this case, the record does not establish that the assets were disposed of for less than what they were worth. C.J. Reed, at the time James and Precious took possession of its stock, was encumbered by a debt of over half a million dollars. The income approach to valuation taken by Christine's expert witness does not appear to have accounted for that debt in valuing the business. But even if it had, the record also establishes that James and Precious were not able to sell the business for enough money to cover the debt. While James and Precious took C.J. Reed as an asset from the marital estate, they also relieved the marital estate of the debt that Christine and Jeffrey had incurred. In short, the record does not establish that the transfer of C.J. Reed diminished the total value of the marital estate.
Similarly, the record does not establish that Jeffrey's sale of his interest in R.S. Wheel was for less than fair market value. At the time of trial, the real property that was R.S. Wheel's sole asset was encumbered by debt greater than the original purchase price of the property. Nor does the record contain an independent appraisal of the property's value.
Christine relies on the fact that by the time of trial, the property had been listed for sale at a far greater price than had been paid for it. But the record establishes that the property had not sold at that price, and Jeffrey testified that the listing price was based on improvements to the property that had not yet been made. Beyond that, it is clear from the record that the listing price was an amount that Schneider and Jeffrey hoped, but did not expect, to receive. A price is the amount that a willing seller indicates would be acceptable payment for property offered for sale, but value is the price actually obtainable for property offered for sale in a market.[33]
In other words, the listing price was what R.S. Wheel was asking for the property, but "[a]sking is one thing, getting is something quite different."[34] The listing price was not sufficient to prove the fair market value of the property, in the absence of other evidence establishing that the property was worth more than had been paid for it less than 6 months before Jeffrey's interest in R.S. Wheel had been transferred. Because the record does not establish that R.S. Wheel's assets were worth more than its outstanding debt, there is no evidence that Jeffrey's interest in R.S. Wheel was worth more than the $15,000 Schneider paid for it. Thus, there is no evidence that the marital estate was diminished by the transfer.
On our de novo review of the record, we find no evidence showing that the value of the marital estate was diminished by the transfers of C.J. Reed and R.S. Wheel. The district court did not abuse its discretion in declining to include those assets in the marital estate. We find no merit to Christine's remaining assignments of error.

CONCLUSION
On rehearing, our original opinion in this matter is withdrawn. And for the reasons stated above, we affirm the judgment of the district court.
AFFIRMED.
NOTES
[1] Neb. Rev. Stat. §§ 36-701 to 36-712 (Reissue 2008).
[2] See Reed v. Reed, 275 Neb. 418, 747 N.W.2d 18 (2008).
[3] Sitz v. Sitz, 275 Neb. 832, 749 N.W.2d 470 (2008); Zahl v. Zahl, 273 Neb. 1043, 736 N.W.2d 365 (2007).
[4] In re Interest of Taylor W., 276 Neb. 679, 757 N.W.2d 1 (2008).
[5] Reed, supra note 2, 275 Neb. at 425, 747 N.W.2d at 23.
[6] See id.
[7] See, e.g., Buchanan v. Buchanan, 266 Va. 207, 585 S.E.2d 533 (2003); A & L, Inc. v. Grantham, 747 So. 2d 832 (Miss. 1999); Clayton v. Clayton, 153 Vt. 138, 569 A.2d 1077 (1989); Fricke v. Fricke, 491 A.2d 990 (R.I. 1985); Pennock v. Pennock, 356 N.W.2d 913 (S.D. 1984); Pattillo v. Pattillo, 414 So. 2d 915 (Ala. 1982); Du Mont v. Godbey, 382 Mass. 234, 415 N.E.2d 188 (1981); Adamson v. Adamson, 273 Or. 382, 541 P.2d 460 (1975); Pierson v. Barkley, 253 Ark. 131, 484 S.W.2d 872 (1972); Powers v. Powers, 229 Ga. 450, 192 S.E.2d 268 (1972); Stephenson v. Stephenson, 111 N.H. 189, 278 A.2d 351 (1971); Caldwell v. Caldwell, 5 Wis. 2d 146, 92 N.W.2d 356 (1958); Rozan v. Rozan, 49 Cal. 2d 322, 317 P.2d 11 (1957); Zingone v. Zingone, 136 Colo. 39, 314 P.2d 304 (1957); Hasegawa v. Hasegawa, 290 A.D.2d 488, 736 N.Y.S.2d 398 (2002); Firmani v. Firmani, 332 N.J. Super. 118, 752 A.2d 854 (2000); Bradford v. Bradford, 993 P.2d 887 (Utah App. 1999); Dietter v. Dietter, 54 Conn. App. 481, 737 A.2d 926 (1999); Gerow v. Covill, 192 Ariz. 9, 960 P.2d 55 (Ariz. App. 1998); Leathem v. Leathem, 94 Ohio. App. 3d 470, 640 N.E.2d 1210 (1994); Johnson v. Dowell, 592 So. 2d 1194 (Fla. App. 1992); In re Marriage of Pahlke, 154 Ill. App. 3d 256, 507 N.E.2d 71, 107 Ill. Dec. 407 (1987); Sherry v. Sherry, 108 Idaho 645, 701 P.2d 265 (Idaho App. 1985); Sloan v. Sloan, 683 S.W.2d 751 (Tex. App. 1984); In re Marriage of Huth, 437 N.E.2d 1042 (Ind. App. 1982); Beatty v. Beatty, 186 So. 2d 855 (La. App. 1966). See, also, Wallace v. Wallace, 170 W. Va. 146, 291 S.E.2d 386 (1982); Rozan v. Rozan, 129 N.W.2d 694 (N.D. 1964). See, generally, Brett R. Turner, Division of Third-Party Property in Divorce Cases, 18 J. Am. Acad. Matrim. Law 375 (2003).
[8] See, Firmani, supra note 7; Bradford, supra note 7; Dietter, supra note 7; Gerow, supra note 7; In re Marriage of Zabel v. Zabel, 210 Wis. 2d 336, 565 N.W.2d 240 (Wis. App. 1997); Varner v. Varner, 662 So. 2d 273 (Ala. Civ. App. 1994). Cf. Chu v. Hong, 249 S.W.3d 441 (Tex. 2008).
[9] Compare, Unif. Fraudulent Transfer Act, 7A (part II) U.L.A. 2 (2006); Unif. Fraudulent Conveyance Act, 7A U.L.A. 427 (1985). See, Du Mont, supra note 7; Caldwell, supra note 7. See, also, Rozan, 129 N.W.2d 694, supra note 7; Galgano v. Ortiz, 287 A.D.2d 688, 732 N.Y.S.2d 77 (2001).
[10] See, Du Mont, supra note 7; Bradford, supra note 7; In re Marriage of Zabel, supra note 8. See, also, Zingone, supra note 7; Johnson, supra note 7.
[11] See Parker v. Parker, 268 Neb. 187, 681 N.W.2d 735 (2004).
[12] Pestal v. Malone, 275 Neb. 891, 750 N.W.2d 350 (2008).
[13] Neb. Rev. Stat. § 25-323 (Reissue 2008).
[14] See Pestal, supra note 12.
[15] See Dillon Tire, Inc. v. Fifer, 256 Neb. 147, 589 N.W.2d 137 (1999).
[16] See Langemeier v. Urweiler Oil & Fertilizer, 259 Neb. 876, 613 N.W.2d 435 (2000).
[17] See id.
[18] First Nat. Bank of Plattsmouth v. Gibson, 69 Neb. 21, 26, 94 N.W. 965, 967 (1903). See, also, Scheve v. Vanderkolk, 97 Neb. 204, 149 N.W. 401 (1914); Ainsworth v. Roubal, 74 Neb. 723, 105 N.W. 248 (1905).
[19] See, Valvanis v. Milgroom, 529 F. Supp. 2d 1190 (D. Haw. 2007); Nastro v. D'Onofrio, 263 F. Supp. 2d 446 (D. Conn. 2003); Tanaka v. Nagata, 76 Haw. 32, 868 P.2d 450 (1994); Estes v. Titus, 273 Mich. App. 356, 731 N.W.2d 119 (2006), affirmed in part and in part vacated on other grounds 481 Mich. 573, 751 N.W.2d 493 (2008).
[20] See, Becker v. Becker, 138 Vt. 372, 416 A.2d 156 (1980); Murray v. Murray, 358 So. 2d 723 (Miss. 1978). Cf. McGinley v. McGinley, 7 Neb. App. 410, 583 N.W.2d 77 (1998).
[21] See Gerow, supra note 7.
[22] See Baker v. Baker, 201 Neb. 409, 267 N.W.2d 756 (1978).
[23] See An Act Against Fraudulent Deeds, Alienations, etc., 1570, 13 Eliz. c. 5, § 2 (Eng.).
[24] See, generally, Mejia v. Reed, 31 Cal. 4th 657, 74 P.3d 166, 3 Cal. Rptr. 3d 390 (2003).
[25] See, generally, Unif. Fraudulent Transfer Act, supra note 9, Prefatory Note, 7A (part II) U.L.A. 4.
[26] See, Harris v. Harris, 261 Neb. 75, 621 N.W.2d 491 (2001); Baker, supra note 22; Malin v. Loynachan, 15 Neb. App. 706, 736 N.W.2d 390 (2007).
[27] See § 36-708.
[28] Vaccaro v. City of Omaha, 254 Neb. 800, 579 N.W.2d 535 (1998).
[29] See Baker, supra note 22.
[30] Harris, supra note 26.
[31] Id. at 87, 621 N.W.2d at 501.
[32] See, id.; Malin, supra note 26.
[33] State v. Garza, 241 Neb. 256, 487 N.W.2d 551 (1992).
[34] Id. at 264-65, 487 N.W.2d at 557.