IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

SCHMIDT V. PARKERT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JASON P. SCHMIDT, APPELLANT AND CROSS-APPELLEE,

V.

LANA H. PARKERT, APPELLEE AND CROSS-APPELLANT.

Filed May 23, 2017.    No. A-16-919.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Rodney C. Dahlquist, Jr., of Dornan, Lustgarten & Troia, P.C., L.L.O., for appellant.

Lindsay Belmont and Angela Dunne, of Koenig Dunne, P.C., L.L.O., for appellee.

INBODY, RIEDMANN, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Jason P. Schmidt appeals and Lana H. Parkert cross-appeals from a decree of dissolution entered by the district court, which decree dissolved the parties' marriage, divided the marital assets and debts, awarded the parties joint physical and legal custody of their minor child, and ordered Jason to pay child support and alimony. On appeal, Jason asserts that the district court erred in awarding the parties joint custody of their child and in awarding Lana alimony. On cross-appeal, Lana asserts that the district court erred in failing to order Jason to pay a portion of her attorney fees. For the reasons set forth herein, we affirm the decision of the district court in its entirety.

## II. BACKGROUND

Jason and Lana were married in October 2007. Their daughter, Ella, was born in April 2010. By the time of the dissolution proceedings, Ella was six years old.

On August 4, 2015, Jason filed a complaint for dissolution of marriage. In the complaint, Jason specifically asked that the parties' marriage be dissolved; that their marital assets and debts be equitably divided; and that he and Lana be awarded joint physical and legal custody of Ella. On August 19, 2015, approximately two weeks after filing the complaint for dissolution of marriage, Jason filed a motion for temporary allowances. In that motion, Jason asked that he be awarded temporary custody of Ella pending the dissolution proceedings.

On August 21, 2015, Lana filed an answer and counterclaim for dissolution of marriage. Therein, Lana asked that the parties' marriage be dissolved; that their marital assets and debts be equitably divided; that she be awarded sole physical and legal custody of Ella; and that she be awarded child support, alimony, and attorney fees.

On November 9, 2015, Jason filed a motion again requesting that he be awarded temporary custody of Ella pending the dissolution proceedings. In the motion, Jason alleged that Lana had recently left a voicemail on his telephone during which she appeared highly intoxicated and indicated that she was thinking about buying a gun to use on herself. Jason further alleged that Lana also indicated on the voicemail that she was not sure "if Ella could ever be okay with her." Jason requested that he be awarded temporary custody of Ella and that any time Lana spent with Ella be supervised by one of Lana's parents.

On November 13, 2015, the district court entered a temporary order based on the agreement of the parties. Jason and Lana agreed to share custody of Ella such that Ella would spend half of her time with Jason and half of her time with Lana. The parties further agreed that Lana's time with Ella would be supervised by one of Lana's parents pending a subsequent hearing. That subsequent hearing was held a few days later, on November 19. After that hearing, the district court entered another temporary order. In that order, the court awarded Jason and Lana joint physical and legal custody of Ella. The parties' parenting time remained essentially the same as in the previous order, but there was no longer any directive that Lana's time with Ella be supervised. Also in the temporary order, the court ordered Jason to pay $737 per month in child support and $500 per month in alimony.

After the entry of the temporary order and prior to trial, Jason filed multiple motions. These motions included a motion to vacate the court's award of temporary alimony to Lana and a motion to appoint a guardian ad litem for Ella or, in the alternative, to order a formal custody evaluation. The district court denied these motions.

Jason also filed a motion requesting that the court authorize weekly therapy sessions for Ella. In this motion, Jason alleged that Lana had not consented to the therapy sessions. However, Jason also indicated that he had only asked Lana about the therapy approximately one week prior to filing his motion. Jason later withdrew this motion from the court's consideration after Lana agreed to allow Ella to attend therapy. Ella began attending therapy in March 2016. In April 2016, Lana revoked her consent for the therapy sessions because she did not feel she was receiving adequate updates about Ella's progress. After Lana revoked her consent, Jason filed a motion

requesting the district court enter an ex parte order allowing Ella to continue with the therapy. The court granted Jason's motion.

Jason filed a motion requesting that he be allowed to amend his complaint. The court granted the motion and Jason filed his amended complaint on February 10, 2016. In the amended complaint, Jason requested that he be awarded primary physical and legal custody of Ella. He also asked that neither he nor Lana be awarded alimony.

In June 2016, trial was held. Prior to the start of the presentation of evidence, the parties informed the court that they had come to an agreement on the distribution of the marital property. That agreement included that Jason would pay to Lana an equalization payment of $12,500. As a result of this agreement, the remaining issues to be decided at trial included custody of Ella, child support, alimony, and attorney fees.

At trial, Jason testified concerning his employment, his current financial situation, his relationship with Ella, and his current relationship with Lana. In addition to his own testimony, Jason offered the testimony of Ella's therapist, April Blevins, and the testimony of some of his family members.

Jason is currently employed with Union Pacific Railroad as a director of marketing and sales. He has worked for Union Pacific for 13 years and in 2015 he earned a gross annual income of $185,077, which included a bonus. Jason testified that these bonuses are not guaranteed, but the evidence revealed that he had received bonuses in 2013, 2014, and 2015. In 2015, Jason's bonus totaled approximately $29,000. Jason continues to reside in the marital home and his monthly mortgage payment is $1,546.

Jason testified that he is a very involved father. In fact, he indicated that he has been Ella's primary caregiver and has performed the "primary parenting functions" for her including feeding her, driving her to and from daycare, participating in her extracurricular activities, reading to her, and playing with her. He testified that he is requesting sole custody of Ella because Lana does not make Ella's best interests a priority and because he is unable to work with Lana to make decisions. Jason testified that he initially requested a joint custody arrangement, but by the time of trial, he did not believe that such an arrangement would be in Ella's best interests. Jason testified that his efforts to make a joint custody situation work have not been successful. However, Jason admitted that he and Lana had been able to agree on educational decisions for Ella since the time of their separation. In addition, he testified that there are no disputes between him and Lana about religious decisions.

Jason testified that during the marriage Lana physically assaulted him when Ella was present in the home. He indicated that Lana has scratched him, punched him, and grabbed his throat. Jason also testified that Lana has yelled at him in Ella's presence, including using profanity. Jason indicated that he has never fought back against Lana.

Jason offered the testimony of Ella's therapist, April Blevins, to support his request for sole custody. Blevins testified that she is a licensed mental health practitioner who is qualified to provide therapeutic services to children. Blevins testified that she has seen Ella for therapy sessions since March 2016. Blevins indicated that she has no concerns with Jason's parenting of Ella. She believes that Jason and Ella have a stable relationship and that Ella receives nurturing and "play

stimulation" from Jason. Blevins also testified that it appeared to her that Jason was the parent providing "a substantial portion of the primary key parenting functions."

Blevins testified that she does have concerns with Lana's parenting of Ella. Blevins testified that Ella reports that she feels sad and lonely when she is with Lana because Lana spends a majority of her time in the garage while Ella is inside the house watching television. Ella also reported that she cannot talk to Lana about these feelings because Lana will yell at her. Blevins testified that Ella is not receiving any nurturing or "play stimulation" from Lana and that this is damaging to Ella's mental health. Blevins testified that when she informed Lana about what Ella had been saying, Lana did nothing to address the concerns. Blevins opined that Lana needs to attend therapy with Ella.

Blevins also testified that she had never observed Ella in either Jason's or Lana's home. In addition, she indicated that her relationship with Lana had not always been positive, as Lana had been argumentative with Blevins on occasion.

Jason also offered the testimony of his parents. Both of his parents testified that they had observed Jason and Ella together frequently. Jason's father testified that Jason is very devoted to Ella and her happiness. He also testified that Ella is very happy when she is spending time with Jason. Both of Jason's parents indicated that they did not see Lana very often and that she did not attend most family get-togethers on holidays.

Lana also testified concerning her employment, her current financial situation, her relationship with Ella, and her current relationship with Jason. In addition to her own testimony, Lana offered the testimony of some of her family members.

At the time of the trial, Lana was employed as an "accounting manager" at RGI Image, Inc. She had been working there since March 2016, or for about three months prior to the trial. Her salary at RGI Image, Inc. was $40,000 per year. This salary equates to a net monthly income of approximately $2,500. Prior to her employment with RGI Image, Inc., Lana had been employed as an accounting manager at various other companies throughout the parties' marriage. Lana testified that she had been continuously employed during the marriage and had never been a "stay-at-home mom." However, Lana also testified that there were brief times that she only worked part time.

Lana testified that in October 2015, after the parties separated, she began living in a home which her father purchased for her. She is required to pay a monthly rent of $750 for her use of that home; however, she testified that she had only started paying rent in May 2016. Lana indicated that she does owe her father for the months she did not pay any rent. Lana testified that her father has been paying for her attorney fees and has given her approximately $1,000 in cash since her separation from Jason.

Lana testified that she has provided the "primary parenting functions" for Ella throughout the parties' marriage. She took Ella to all of her appointments, signed Ella up for activities, and organized Ella's schedule. In addition, Lana always bathed Ella and handled her bedtime routine. Lana also testified that she had always managed the household, including, paying bills, cleaning the house, doing the laundry, doing the yard work, and doing the grocery shopping. Lana admitted that she had not attended many of Ella's school events or extracurricular activities. Specifically, Lana testified that she had not attended Ella's preschool graduation and had never taken Ella to

visit Santa or to trick-or-treat on Halloween. However, Lana also testified that many of the activities that she missed occurred during her workday, which prevented her from attending. Lana admitted that Jason was the one who typically took Ella to daycare in the mornings and picked her up in the afternoons.

Lana testified that she was requesting that the parties share physical custody of Ella, but that she be awarded legal custody. Lana believed that Ella had adapted "really well" to the temporary parenting schedule the parties had been following for the past six months. In addition, she testified that she would do her best to keep Jason informed and involved about what was going on in Ella's life. She admitted that she and Jason had problems communicating with each other.

Lana testified that she had physically assaulted Jason during their marriage. She indicated that on one such occasion, Ella was in the home, but was asleep. She also testified that she has cursed and yelled at Jason when Ella was present. Lana admitted that she had left a message for Jason during the pendency of the dissolution proceedings where she told him that she could not handle things anymore and that she planned to purchase a gun. Lana explained that she had just lost her job and was upset.

Lana also offered the testimony of her mother, her father, and her step-mother. Each of these witnesses testified that they had observed Lana and Ella together frequently and that Lana is a good mother. They all indicated that Jason clearly loves Ella very much, but he has a much different parenting style than Lana. They described Jason as a permissive parent who always plays with Ella and gives her attention, but does not discipline her or give her guidance. Lana's mother testified that Lana had been Ella's primary caregiver.

After the trial, the district court entered a decree of dissolution. In the decree, the court awarded Jason and Lana joint physical and legal custody of Ella. The court noted that in making its "custody/parenting time decision" it did not rely "much" on the testimony of April Blevins. In the decree, the court also ordered Jason to pay child support in the amount of $950 per month, ordered Jason to pay alimony in the amount of $1,000 per month for a period of 36 months, and ordered each party to pay their own attorney fees.

Jason appeals and Lana cross-appeals from the decree.

## III. ASSIGNMENTS OF ERROR

On appeal, Jason assigns three errors, which we restate and consolidate into two errors for our review. First, Jason asserts that the district court erred in awarding the parties joint physical and legal custody of their daughter. Second, he asserts that the district court erred in awarding Lana alimony.

On cross-appeal, Lana assigns one error. She asserts that the district court erred in failing to order Jason to pay a portion of her attorney fees.

## IV STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659,

813 N.W.2d 440 (2012); *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009); *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or its action is clearly against justice or conscience, reason, and evidence. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

## V. ANALYSIS

### 1. JASON'S APPEAL

#### (a) Custody

In the decree, the district court awarded Jason and Lana joint physical and legal custody of Ella. The court specifically indicated that such an award was in Ella's best interests. On appeal, Jason challenges the district court's award of both joint physical custody and joint legal custody. Before we address Jason's specific assertions, we examine the relevant considerations in decisions about custody.

In an action for dissolution of marriage involving the custody of minor children, the court is required to make a determination of legal and physical custody based upon the children's best interests. Neb. Rev. Stat. § 42-364(1)(b) (Reissue 2016). The court may grant the parties joint legal custody or joint physical custody, or both, if either (a) both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the children or (b) the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor children regardless of any parental agreement or consent. § 42-364(3).

The standard for determining custody is parental fitness and the child's best interests. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). Nebraska's Parenting Act states that it is in the best interests of the child to have a "safe, stable, and nurturing environment." See Neb. Rev. Stat. § 43-2921 (Reissue 2016). To determine the best interests of a child, a court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). Other pertinent factors a court may consider in determining the best interests of a child include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

We now turn to Jason's specific assignments of error on appeal.

*(i) Joint Physical Custody*

Jason challenges the district court's decision to award the parties joint physical custody of Ella. Jason bases his assertion that joint physical custody is not in Ella's best interests almost solely on the testimony of Ella's therapist. Upon our de novo review of the record, we affirm the decision of the district court to award Jason and Lana joint physical custody.

The Parenting Act defines "[j]oint physical custody" as "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Reissue 2016). The Nebraska Supreme Court has previously stated that joint physical custody must be reserved for those cases where, in the trial court's judgment, the parents are of such maturity that the arrangement will not operate to allow the children to manipulate the parents or confuse the children's sense of direction, and will provide a stable atmosphere for the children to adjust, rather than perpetuating turmoil or custodial wars. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007).

Ella's therapist testified regarding concerns that she had with Lana's parenting of Ella. On appeal, Jason asserts that the therapist's concerns are significant enough to preclude an award of joint physical custody. Jason argues that he should be awarded sole physical custody of Ella. However, as we discussed in the "Background" section above, the district court indicated that it did not rely "much" on the testimony of Ella's therapist. We understand the court's comment to indicate that it did not find the therapist's testimony to be credible, and we defer to the trial court's determinations of witness' credibility. See *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002) (where the evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another).

Other evidence presented at trial, outside of the therapist's testimony, supported the district court's decision to award the parties with joint physical custody. In the district court's temporary custody order, it awarded the parties joint physical custody pending the trial. As such, by the time of the dissolution trial, the parties had been sharing custody of Ella for approximately seven months. Lana testified that Ella had adapted "really well" to the joint custody arrangement. Lana testified, "She knows what days she's going to Daddy's, she knows what days she's with Mommy." In fact, at trial, Lana requested that the court continue the joint physical custody arrangement. While Jason indicated that he did not believe joint physical custody was in Ella's best interests, he did not provide any evidence, beyond the therapist's testimony, to explain his position. There was no evidence that Ella had struggles during the pendency of the dissolution proceedings that were directly tied to the joint physical custody arrangement and there was no evidence that either Jason or Lana had any logistical problems with the arrangement. Jason did testify that Ella had expressed concerns to him about her time with Lana, but Lana presented conflicting evidence to demonstrate that Ella was always happy at Lana's home and enjoyed being with Lana. Given this conflicting evidence, we again defer to the trial court's determinations of witness' credibility. We can assume from the trial court's decision to award the parties joint

physical custody, that it found Lana's evidence about her time with Ella to be more credible than Jason's testimony about his concerns with Lana's parenting.

Given our reading of the record, and given our deference to the trial court's decisions about witness' credibility, we cannot say that the court abused its discretion in awarding the parties joint physical custody of Ella. Jason and Lana have proven themselves capable of making a joint physical custody arrangement work for Ella and there was evidence that Ella is doing well with such an arrangement.

### (ii) Joint Legal Custody

Jason also challenges the district court's decision to award the parties joint legal custody of Ella. Again, Jason bases his assertion that joint legal custody is not in Ella's best interests largely on the testimony of Ella's therapist. In addition, he argues that he and Lana cannot effectively communicate or agree on major decisions about Ella's life. Upon our de novo review of the record, we affirm the decision of the district court to award Jason and Lana joint legal custody.

The Parenting Act defines "[j]oint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." § 43-2922(11). Generally, courts have not awarded joint legal custody when the parties are unable to communicate effectively. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016). However, a trial court's decision to award joint legal custody can be made without parental agreement or consent so long as it is in the child's best interests. *Id.*

At trial, both Jason and Lana testified that they struggle to communicate with each other and that they did not favor an award of joint legal custody. Jason specifically testified that he was unable to effectively communicate or cooperate with Lana. Lana testified that having to work with Jason was a "hassle." There was evidence to support the parties' general assertions that they did not get along very well. Lana admitted to having physically abused Jason on a few occasions during the marriage. She also admitted to having yelled and cursed at him. Both parties indicated that they did not spend much time together during at least the last few years of the marriage.

However, there was also evidence to suggest that, despite the parties' differences, they were capable of making joint decisions for Ella. The parties had been sharing legal custody of Ella since the temporary order was entered in December 2015. During that time, they had agreed, on two separate occasions, to make changes in the school that Ella was attending. In addition, Jason admitted that he and Lana did not have any disputes concerning their religious viewpoints. Based on the evidence presented at trial, it appeared that the only important subject the parties had disagreed on during the pendency of the proceedings was Ella's counseling. And, this dispute seemed to be more about who Ella's counselor should be, not about whether she should attend counseling.

The district court found,

It appears that although the relationship between the parties is very strained, the parties agree on almost all of the major life decisions involving Ella, i.e. school, religion, and medical needs. The parties disagree on counseling for Ella and some doctor appointments, but generally are otherwise in agreement.

We agree with the district court's factual finding. Even though Jason and Lana do not like to communicate or cooperate with each other, they are capable of working with each other for the benefit of Ella. They have demonstrated an ability to put aside their differences to make important decisions. Accordingly, we affirm the decision of the district court to award them joint legal custody of Ella.

(b) Alimony

In the decree, the district court awarded Lana alimony in the amount of $1,000 per month for a period of 36 months. In determining the alimony award, the court noted that although there was "little evidence that [Lana] has not been gainfully employed for most of the marriage," that the parties' current incomes were disparate. The court found that while Lana earned a gross income of about $3,300 per month, Jason earned "total compensation" of about $11,600 per month.

On appeal, Jason asserts that the district court abused its discretion in awarding Lana alimony. Specifically, he asserts that because Lana has been employed throughout the marriage, she does not need alimony. He also asserts that he is incapable of paying alimony given his child support obligation, the parties' property settlement agreement, and his monthly expenses. Upon our de novo review of the record, we affirm the district court's award of alimony to Lana.

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in Neb. Rev. Stat. § 42-365 (Reissue 2016) make it appropriate. *Bergmeier v. Bergmeier*, 296 Neb. 440, ___ N.W.2d ___ (2017). The criteria in § 42-365 include:

> the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Bergmeier v. Bergmeier, supra*. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Id*. Disparity in income or potential income may partially justify an award of alimony. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004). The ultimate criterion is one of reasonableness. *Bergmeier v. Bergmeier, supra*.

The record reveals that Jason earns a significantly higher income than Lana. Based upon the district court's calculations, Jason's net monthly income totals approximately $8,000 per month, while Lana's net monthly income totals $2,500 per month. On appeal, Jason does not specifically contest the district court's calculation of his income, but he does utilize a lower monthly net income to justify his assertions that he is incapable of paying Lana alimony. Brief of appellant at 38. In his brief, Jason contends that his "net base salary" after "mandatory holdings" totals $5,743 per month. *Id*. However, Jason's calculation of his net monthly income fails to take into account the annual bonus he receives from his employer. Jason received an average annual

bonus of $28,500 in the two years preceding the dissolution trial. When this bonus is added to Jason's base salary, as calculated in his brief on appeal, Jason's net monthly income totals much closer to the district court's calculation of $8,000 than to Jason's calculation of $5,743.

Based on the district court's calculation of Jason's net monthly income, it is clear, that after Jason pays child support in the amount of $950 per month, his remaining disposable monthly income totals close to $7,000. As such, Jason's assertion that he is incapable of paying alimony in the amount of $1,000 per month for 36 months is simply without merit.

Moreover, while Jason is correct that the evidence presented at the trial revealed that Lana has been gainfully employed for a majority of the marriage, the evidence also revealed that Lana provided a significant contribution to the marriage, outside of her employment. There was uncontradicted evidence that during the parties' approximately eight year marriage, Lana managed the household, including, paying bills, cleaning the house, doing the laundry, and doing the yardwork.

Given the parties' current incomes and given Lana's significant contributions to the marriage, we cannot say that the district court's award of alimony is untenable or unreasonable. We find that the district court did not abuse its discretion in ordering Jason to pay Lana alimony in the amount of $1,000 per month for a period of 36 months.

## 2. LANA'S CROSS-APPEAL

In the decree, the district court ordered each party to pay their own attorney fees. In her cross-appeal, Lana asserts that the district court abused its discretion in failing to order Jason to pay at least a portion of her attorney fees. Specifically, Lana asserts she was entitled to an award of attorney fees because Jason filed multiple pre-trial motions, which were ultimately unsuccessful and which increased the attorney fees she incurred. She also asserts an award of attorney fees is warranted because Jason's income is significantly higher than her income. Upon our de novo review of the record, we affirm the decision of the district court.

An award of attorney fees is discretionary and will not be disturbed on appeal absent an abuse of discretion. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Id*. Customarily in dissolution cases, attorney fees and costs are awarded only to prevailing parties or assessed against those who file frivolous suits. *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001).

Lana presented an attorney fee affidavit at trial, showing that she had incurred legal fees from her attorney in the amount of $39,426. This amount included estimated trial costs of $3,685.00 and "anticipated post-trial costs" of $1,000. Excluding these estimated costs, Lana incurred almost $35,000 in pre-trial legal fees. On cross-appeal, Lana argues that her pre-trial legal fees were significantly increased by Jason filing numerous pre-trial motions because her attorney was "required to spend numerous hours preparing, researching, corresponding, defending, and attending hearings set by Jason." Brief for cross-appellant at 7. While we agree that there were a number of pre-trial motions filed in this case and that many of those motions were filed by Jason

and were, ultimately, unsuccessful, we cannot say that the district court abused its discretion in failing to award Lana attorney fees, given the parties' current financial circumstances.

First, we note that both Lana and her father testified at trial that her father was paying for her legal fees. Lana's father testified that by the time of trial, he was "caught up" paying for all of the fees that had been previously billed to Lana. Lana testified that there was no agreement between her and her father about her having to reimburse him for his payments. Accordingly, it does not appear that Lana's financial circumstances were significantly affected by the district court's decision not to award her any attorney fees.

In addition, although Jason does earn more income than Lana, the district court did award Lana alimony, as we discussed above. Lana's current financial circumstances have also been improved by the financial assistance she has received from her mother and father. Lana's father had given her $1,000 in cash during the pendency of the dissolution proceedings, and he had paid for the utilities on her rental home. Lana testified that her mother had also assisted her financially. We also cannot overlook that Lana agreed to a property settlement where she receives an equalization payment of $12,500.

Based on the all of the evidence presented at trial, we cannot say that the district court abused its discretion in failing to order Jason to pay for any of Lana's attorney fees. As such, we affirm the decision of the district court.

## VI. CONCLUSION

Upon our review, we affirm the decision of the district court to award the parties joint physical and legal custody of their minor child, to award Lana alimony in the amount of $1,000 per month for a period of 36 months, and to order each party to pay their own attorney fees.

AFFIRMED.