IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


HOLEN V. HOLEN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


CLAIRE C. HOLEN, APPELLEE,

V.

ERIK T. HOLEN, APPELLANT.


Filed December 12, 2017.    No. A-16-1201.


Appeal from the District Court for Phelps County: TERRI S. HARDER, Judge. Affirmed in part, affirmed in part as modified, reversed and remanded in part with directions, and in part reversed and vacated.

Kent A. Schroeder, of Ross, Schroeder & George, L.L.C., for appellant.

Jane F. Langan Mach, of Rembolt Ludtke, L.L.P., for appellee.


MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Phelps County District Court dissolved the marriage between Claire C. Holen and Erik T. Holen. A decree, as amended, was entered from which both parties have appealed and assigned numerous errors related to property, child custody, child support, alimony, and attorney fees. Some portions of the decree are reversed and remanded with directions or vacated, one provision is modified, and the balance of the decree is affirmed.

## II. BACKGROUND

Claire and Erik were married in October 2005. They had three children, a son (born 2009) and two daughters (born 2011 and 2012). At the time of trial, Claire was 39 years old, and Erik was 42.

Claire is from St. Louis, Missouri. She has a degree in psychology from the University of Missouri, and was accepted into the University of Missouri Law School in 2000, but did not attend, opting not to pursue a career in law. Erik is from north of Loomis, Nebraska, near Holdrege, Nebraska. In 2001, he moved to St. Louis while working for an insurance company. After the insurance company he worked for went out of business, he started working for a home improvement company, where he met Claire in August 2002. At the time, Claire was working part time as the finance manager of the home improvement company; she later provided care for her cousin's daughter. Erik later worked for a mortgage brokerage business in St. Louis, and in January 2005, he moved to Phoenix, Arizona, as part of a promotion. Claire moved to Phoenix in March, and the parties got married in October. Shortly after the parties married, Erik went to work for another mortgage company, but that company closed Erik's office in early 2008 and he looked for opportunity in a number of small ventures. While in Phoenix, Claire worked as a marketing assistant for Club Assist, earning $40,000 per year. In 2007, Claire was promoted and became the marketing manager for North America, earning $65,000 per year. In Phoenix, Claire was the one who had the "consistent income" and benefits.

In August 2008, the parties were struggling in their marriage and Erik moved back to Holdrege so he could farm. Claire followed in September, but continued to work for Club Assist, which required her to travel. The parties' son was born prematurely in March 2009. A few months after their son's birth, Claire became a stay-at-home mother, in part because her position at Club Assist was being relocated to Los Angeles, California, and would have required her to move, and in part because it was more important for her to stay at home with the parties' premature son. She did not work outside of the home again until shortly before the divorce proceedings were filed, when she got a part-time job at the YMCA earning $11 per hour. Since February 2016, she has also done some marketing consulting work for NorthStar Battery; she works from home and the hours she works are project dependent.

In October 2014, Claire filed a complaint for dissolution of marriage. The following month, Erik filed an answer and counterclaim. Claire asked for sole legal and physical custody of the children, while Erik asked that he and Claire be granted joint legal and physical custody. Claire sought child support and also asked that "uninsured health care" and work-related childcare expenses be allocated between the parties. Each party asked for an equitable division of their assets and debts. Additionally, Claire requested temporary and permanent alimony, attorney fees, and costs. And Erik requested an order restraining both parties from certain actions related to the parties' "property assets," except in the usual course of business or for the necessities of life.

In its temporary order filed on December 22, 2014, the district court awarded legal and physical custody to Claire (although, the parenting plan incorporated into the temporary order says the parties were awarded joint legal custody), subject to Erik's parenting time every other weekend, two evenings each week, alternating holidays, and 4 weeks every summer. Beginning December 1, Erik was ordered to pay child support of $1,339 per month, and spousal support of $1,250 per month. He was also ordered to provide health insurance for Claire and the children during the pendency of the proceedings. Additionally, Erik was ordered to continue making the mortgage payment on the marital home, pay temporary attorney fees of $3,500, and expert witness fees in the amount of $5,000.

On December 11, 2015, Claire filed a motion for an anti-hypothecation order restraining Erik from certain actions related to any real and personal property or assets owned by either party or their businesses. She alleged that Erik had incurred over $300,000 in debt during the pendency of this case, that he was wasting marital assets, and that his support and other obligations under the temporary order were being paid by incurring debt in an attempt to shift that burden to her. Also on December 11, Claire filed a motion to determine valuation date. She asked the Court for an order determining the date of valuation of the marital estate "to be as of the date of filing of the action or as close a date thereto as reasonably possible," because, as she alleged, Erik wasted assets and incurred over $300,000 in debt.

On January 29, 2016, the court entered an order restraining Erik from certain actions related to any real and personal property or assets owned by either party or their businesses, except in the ordinary course of business, for the necessities of life, or by agreement of the parties. Erik was ordered to "comply with all pending leases and take such actions as may be necessary to preserve the parties' interests therein."

In an order filed on March 22, 2016, the court determined "the date of valuation shall be December 31, 2014. Any pre-paid expenses (for 2015) shall be added back to the marital estate."

Trial was held on September 12 and 13, 2016. A number of the property issues had been settled, but still at issue was an option to purchase farmland contained in a lease agreement, and the related Dakota MAC debt. Also contested were issues of child custody and parenting time, child support, alimony, and attorney fees. Claire and Erik testified, and each had other witnesses testify on her or his behalf.

The district court entered a decree of dissolution on November 4, 2016. On agreement of the parties, the court awarded "joint custody" of the minor children. However, it is clear the court meant joint *legal* custody, because it went on to award physical custody to Claire, subject to Erik's specified parenting time. Erik's parenting time includes every other weekend from 3:30 p.m. on Friday until 8 a.m. on Monday; midweek parenting time every Monday from 3:30 p.m. to 7:30 p.m. when Claire works, and "if [Claire] works a second weekday evening each week, then [Erik] shall have the children from 3:30 - 7:30 p.m. that evening too"; 4 weeks every summer; and 4 weeks every winter commencing with his second weekend of parenting time in January. Holiday parenting time was also scheduled. Erik was ordered to pay $686 per month in child support, but child support "shall abate by 50% during the months of June and January each year commencing in 2017." Erik was ordered to provide, maintain, and pay for health insurance coverage for the minor children as long as it is available to him through his employer, with the same deductible and the same coverage as currently in force. He was ordered to pay 59-percent of employment or education-related daycare expenses, and 59-percent of nonreimbursed healthcare expenses incurred by the children after the first $480 per child has been paid by Claire each year; however, the total daycare and or unreimbursed medical expenses may not exceed $113 per month "due to the poverty guidelines."

The district court divided the parties' assets and debts. In particular, Erik was awarded an option to purchase certain real estate, which the court valued at $1,023,061. Erik was ordered to pay a $160,580 property equalization to Claire. Claire was not awarded alimony. Each party was ordered to pay their own attorney fees, but Claire was ordered to pay costs.

Claire filed a motion for new trial or to alter or amend judgment, and Erik filed a motion to alter or amend the decree. The district court addressed both motions in an order filed on December 6, 2016. The district court overruled Erik's motion in its entirety. In response to Claire's motion, the district court amended the decree to provide that Erik should pay alimony in the amount of $1 per year for 3 years (2017, 2018, and 2019); it overruled the balance of Claire's motion.

Erik timely appealed, and Claire cross-appealed.

## III. ASSIGNMENTS OF ERROR

Erik assigns 14 errors to the district court, which we consolidate and restate as follows: the district court erred in (1) its findings and determinations with respect to the unexercised option to purchase land, (2) failing to require Claire to account for $23,373.42 removed from an account after the court-ordered date of valuation, (3) failing to award joint physical custody to the parties or, in the alternative, more parenting time to Erik, (4) its determinations with respect to child support, particularly failing to use Claire's earning capacity when determining support, and (5) failing to order both parties to provide health insurance coverage for the children.

Claire assigns on cross-appeal that the district court erred by: (1) not averaging Erik's income for purposes of child support and alimony, (2) capping Erik's reimbursement for daycare and medical expenses at $113 per month, and (3) failing to award her attorney fees.

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Lorenzen v. Lorenzen*, 294 Neb. 204, 883 N.W.2d 292 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*.

Child custody and parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

# V. ANALYSIS

## 1. OPTION TO PURCHASE

### (a) Background

In early 2009, Erik approached his maternal grandmother, LaVaughn Larson, about farming her land. In February of that year, Erik and Claire signed a promissory note to Larson for $580,000, and received a joint tenancy warranty deed from Larson for her property in Phelps County, Nebraska. In 2009 and 2010, Erik and Claire attempted to get a loan through First Dakota National Bank (hereafter referred to as Dakota MAC) to finance the land purchase, but the loan was rejected. So, in April 2010, Erik and Claire deeded the land back to Larson, and the parties entered into a lease agreement with an option to purchase (Agreement) that same land.

The Agreement (exhibit 47) states in relevant part:

### LEASE AGREEMENT WITH OPTION TO PURCHASE

This Agreement, made and entered into by and between LaVaughn F. Larson, a single person, ("Larson"); and Erik Holen and Claire Holen, ("Tenant");

1. Larson hereby rents to Tenant and Tenant rents from Larson the following agricultural real estate, to wit:

[Legal description of property given.]

2. Tenant agrees to pay $20,000.00 per year rent to Larson. Rent to be due and payable on or before November 15 of each year beginning November 15, 2010, for a period of ten years. Rent shall be paid directly to Larson. If rent is unpaid when due, Larson may terminate this agreement after thirty (30) days' notice and take action for possession. Any rental payment more than 10 days past due shall be assessed a $25 late fee. This agreement may be terminated by either party upon notice in writing on or before September 1 for the next year; or upon any breach according to the terms of this agreement.

. . . .

### Option to Purchase

9. In consideration of the mutual promises contained herein, Tenant is hereby granted an Option to Purchase the property for 10 years after this lease is executed. If Tenant exercises the option, the following terms and conditions shall apply and are hereby agreed to by the parties:

. . . .

b. The purchase price of the property shall be $580,000.00. Tenant may receive credit against this amount for the $20,000.00 annual rental payments if it is made timely. This amount shall accumulate during the term of this agreement, i.e. if the rent is paid timely for 4 years prior to exercise of the Option to Purchase, the purchase price will be reduced by $80,000.00.

In February 2013, the parties and Larson signed an "Amendment to Lease Agreement with Option to Purchase" (exhibit 47), reducing the purchase price to $480,000. The amendment stated, "All the remaining terms, conditions and provisions of the original agreement are hereby confirmed and ratified."

In November 2013, Erik and Claire attempted to get a $485,000 loan from Dakota MAC in order to exercise the option to purchase the property, but their loan was denied. David Boyd Mignery, the loan officer from Dakota MAC, testified the loan was denied because of the "overall credit worthiness of the application that we were presented." The parties continued to lease the land and made a timely rent payment in 2013. In 2014 the parties made a timely rent payment of $18,000, and Larson forgave the other $2,000.

According to Erik, he and Claire had some farm debt at Dakota MAC/Agri-Access secured by Larson's land, and in September 2014, that debt was nearing its limit and was refinanced. Claire said it was her understanding the loan to operate the farm was up for renewal or extension. Regardless, the evidence shows the loan was refinanced in September; the refinance occurred after Erik had moved out of the marital home in August and before the divorce proceedings were filed in October.

To refinance, the parties and Larson applied to Dakota MAC for a loan of $750,000. The "Promissory Note/Loan Agreement Revolving Line of Credit," states that Erik, Claire, and Larson were the "borrower[s]," and Dakota MAC was the "lender"; the agreement was signed by both parties, Larson, and loan officer Mignery. The loan was secured by a Deed of Trust issued by Larson to the bank for her land. And as part of the refinancing agreement, Erik and Claire were required to subordinate their Agreement. The September 2014 subordination agreement shows the Agreement was to be subordinate and junior to the lien of the deed of trust securing the refinance loan. The September refinance summary was signed by both parties, Larson, and a representative from the title company. The document shows $352,776.11 in total debt, including a payoff for the first mortgage to Agri-Access of $266,597.43, other expenses paid (e.g. credit card, fertilizer, irrigation equipment), and expenses associated with the refinance. The refinance was a line of credit for $750,000, so almost $400,000 remained available in the line of credit after paying off the first mortgage and other noted expenses.

Erik testified he was no longer living in the marital home at the time of the September 2014 refinancing, and it was "very possible" he had borrowed another $150,000 as of December 31, 2014. The order for temporary child and spousal support commenced December 1. He agreed the balance of the Dakota MAC debt by December 31 was approximately $504,000. When asked what he did with $150,000 in less than 3 months, he responded, "The loan that was near its max, the cost of farming, with the farming, there were bills payable. I had invoices paid." He added, "Farming is not cheap." Erik said he used this line of credit to pay farming expenses (harvesting costs, fertilizer bills, "machinery hire"), attorney fees, and "living" expenses, including "supporting the family" and writing "Claire many checks before the end of the year."

On August 1, 2016 (6 weeks before the parties' divorce trial), Larson's attorney sent a letter (exhibit 63) titled "Notice to Terminate Tenancy and Option" (termination letter) to Erik and Claire, giving them "formal notice" their lease with Larson would terminate on February 28, 2017. The termination letter also stated the option to purchase became unenforceable in September 2014, when the property was pledged at Erik and Claire's request to secure their debt and obligations up to an amount of $750,000, because "the circumstances were irreparably changed from their original state." It continues, "Therefore, the only right you [Erik and Claire] have to the property is the lease, which will be in effect until the end of February, 2017, at which time it will expire and you will have no further interest in the real estate."

The termination letter also pointed out the following. Larson entered into the original agreement to help Erik start his farming career at a level of rent and an option price which were both below the market price, and the underlying assumption of all parties was if the option were exercised, Larson would receive the price as calculated in accordance with the Agreement. In 2011, Larson was awarded the Nebraska Pioneer Farm Award which recognizes 100 years of continuous family ownership. The reason for granting the original option was to continue ownership of the farm in the family through Erik, but Larson had since been informed through a review of the deposition of a valuation expert that it may be the parties' intention to exercise the option and then sell the property. "This clearly would end a long history of family ownership and is contrary to [Larson's] intentions and the underlying assumptions when the Option to Purchase was granted."

The valuation expert referred to in the termination letter is Reed Samson, a certified public accountant, with certifications in business valuation and financial forensics. He was retained by Claire to assist with valuing the option contained in the lease. Samson valued the option at $1,088,061, as of December 31, 2014, but determined that if the option was exercised, the property would likely have to be sold to satisfy the debt because the farm operations alone would be unlikely to sustain the payments. He stated, "[I]n looking at the results of operations over the last several years, and in particular would liken it to changes in commodity prices and otherwise, that it would be a very difficult task to service the debt if they did exercise it given the way the farm economy ebbs and flows." He added, "[I]t didn't appear that the operations themselves were going to be sufficient to sustain both standard of living as well as repay the debt."

Also, since Samson concluded the only way to repay the debt attached to the property was if the property was sold, he included tax consequences in his evaluation to avoid "overstating the value of that option." In valuing the option, Samson said he used "a very commonplace methodology of valuing real options." He noted that other approaches, such as Black-Scholes and other methodologies are "more useful in situations where you're valuing securities that are to be valued upon a certain event or series of events[,]" and those "methodologies although are common in valuing options themselves, they are very rarely used in valuing real options." "[T]hose options are really more akin to securities or other advanced financial instruments." He pointed out that "[r]eal options are significantly different than financial options in that their value is based on a physical asset versus a stock or other security." He noted that land options, such as this Agreement, "are a type of call option commonly used in real estate," and a "call option is the right but not the obligation to purchase an underlying asset for a predetermined price (the 'strike' price)."

As for valuing the option to purchase in the present matter, Samson said "[t]his is a very straightforward real property option." Samson considered what the "strike price" or "exercise price" was as compared to the fair market value of the property. "In this situation the appraisal that was prepared in August of 2015 certainly reflected a fair market value in excess of the strike point." Samson said the adjusted strike price used in this instance would be $442,000 to reflect the option price of $480,000 less the two payments of rent ($20,000 and $18,000). According to the August 2015 appraisal relied upon by Samson, the fair market value of the real estate was $1,530,061, so the option, before any consideration for income tax, had a value "to the tune of a little over a million dollars," specifically, $1,088,061. (Subtracting the adjusted strike price of $442,000 from the $1,530,061 fair market value of the real estate equals $1,088,061.) Samson further opined that if the property were held for a year and a day before selling, a long-term capital gain tax rate could

be used instead of a short-term capital gain rate, a difference of "almost 20 percentage points." Samson calculated the long-term capital gain to result in $283,558 in federal and state taxes.

On cross-examination, Samson was asked why he did not subtract the debt of $504,000 (existing as of December 31, 2014) from the appraised value. He responded, "The value of the option is one matter. The value of the debt is another matter. So it would be offsetting in the property statement." However, Samson did agree he was not aware of any cases that addressed the method employed to value an option to purchase real estate, nor was he aware of any case in any other jurisdiction regarding the valuation of options to purchase real estate. Samson acknowledged that in his 41-year career, he had never prepared a report on an option to purchase real estate "for a court setting." He further acknowledged he had not been apprised "that the parties subordinated their option to purchase agreement to the operating capital lender." Samson had not seen the September 2014 subordination agreement until it was presented to him at trial on cross-examination, and after taking time to review it during a court recess, Samson agreed the subordination document required the Holens to obtain permission from Dakota MAC to exercise the option to purchase the land. Samson acknowledged exercising the option would require a coordinated effort, specifically, "If one were to try to effectuate the option, you'd have to get the approval of all the parties, whoever is going to loan you the money for the option price as well as the existing lien holder in that regard."

Erik testified he and Claire never talked about or considered exercising the option to purchase after refinancing in September 2014. According to Erik, in September 2014, the option was still in full force and effect, and as of December 31 of that year, he had not done anything to jeopardize his rights under the lease.

Erik testified he had been notified he would not be farming Larson's land the next year (2017). When asked if he expected to farm the land in the next 5 years, Erik, responded, "I have no idea what [Larson's] plans are." He did not know if the land would go back to him when the divorce was over; he stated, "I have no idea what [Larson's] intentions are. She's the land owner. It's not up to me." Erik said it is important to Larson that the land be kept in the family. He would never exercise the option, knowing the property would have to be sold, if that was contrary to Larson's wishes.

Larson, who was 96 years old at the time of trial, testified she and her late husband bought the farm from his father in the 1970's, and that it has been in the family for more than 100 years. She recently received the Pioneer Farm Award, which is awarded to individuals who have possessed agricultural real estate for more than 100 years. Erik came back to Nebraska in 2008 to farm the ground she owns. He initially cash-rented the land, and in 2010 the parties and Larson entered into the lease agreement with option to purchase. Under the lease agreement, the rent was $20,000 per year and Erik always made timely payments; one year he paid $18,000, and Larson gave him a break on the rent because he needed some money. According to Larson, the $20,000 rent was below market cost. The option to purchase was originally set at $580,000, but later reduced to $480,000. When asked why she reduced the price, Larson responded, "because [Erik's] my grandson," "he wanted [the land] to farm," and "I want to keep [the land] in the family." She does not want the land sold to a stranger, and affirmed she consulted with her attorney to terminate the lease because she wanted to keep the farm in the family name. On cross-examination, Larson acknowledged that Erik is the only one in her direct line of descendants who farms. When asked

if she planned for Erik to eventually have the farm, Larson replied, "At this point I've not decided." When counsel continued, "But if the idea is that you don't want it to go to anyone outside the family, Erik is the only one who could have it?" Larson answered, "Probably." Larson also acknowledged she spoke with Erik about terminating the lease or option "maybe a month" before she asked her attorney to send the letter dated August 1, 2016, and she thought Erik "was in favor" of terminating the lease and option. There was also evidence that on July 28, 2016, Erik's attorney charged him for revising the letter sent to the parties by Larson's counsel.

In the decree, the district court addressed the termination letter when making its decision to award the option to Erik and to use Claire's proposed value for that option. The decree contained the following statements: "[n]owhere in Larson's letter does she cite to any breach of the [Agreement]"; "[t]here is nothing in the [Agreement] that indicates the landlord has the right to terminate the [Agreement] for the reasons given in Larson's letter"; "[i]t seems apparent from the record that Larson was likely encouraged by [Erik] to terminate the [Agreement]," "[w]hat other reason would there be for giving her Samson's deposition?"; [i]t also does not appear that Larson had a legal basis to terminate the [Agreement] and therefore, [Erik] would have a legal right to enforce the [Agreement]"; and "[b]ecause the option had value on the date of valuation and because the Court believes the termination of the lease/option is a sham and is the result of [Erik] violating the non-hypothecation order, the Court has used [Claire's] value."

Claire's proposed value was $1,023,061 (which was based on Samson's valuation of $1,088,061 less the value of two center pivots owned by the parties). The district court allocated a value of $1,023,061 to Erik for the option, but also gave him a deduction of $283,558 for the "deferred land tax" calculated by Samson for capital gains taxes that would be incurred if the property was sold (assuming the property was held for one year and one day to minimize the tax consequences). The court also allocated solely to Erik the balance of the Dakota MAC debt, which, as of December 31, 2014, was $504,929.

(b) Analysis

Erik contends the option to purchase had no value, and to award "a non-existent hypothetical asset to either party is tantamount to a punitive damage award." Brief for appellant at 16. Erik argues the parties were unable to obtain a loan to exercise the option, and "[i]t was the inability to perform that rendered the option to purchase worthless on December 31, 2014, and every day thereafter." *Id*. at 18. He claims the court abused its discretion by adopting Claire's expert's opinion as to the value of the option, and by awarding the option to Erik. He also contends the district court lacked personal and subject matter jurisdiction for matters related to the lease because Larson was not made a party to the action. Finally, he claims the court erred in determining he violated the non-hypothecation order regarding termination of the lease agreement with option to purchase.

*(i) Option to Purchase Was Marital Asset*

The primary issue here is whether or not the unexercised option to purchase Larson's real estate was a marital asset which could be valued and then awarded to just one party. Erik claims the option was a "hypothetical asset" with no value because the parties were not in a financial position to exercise the option. We conclude the problem here is not the district court's

classification of the option as a marital asset; rather, the problem, or inequity, stems from allocating a million dollar value for that asset to only one spouse based on the facts present in this case; specifically, the financial circumstances of the parties and the uncertainty of whether the option could still be exercised.

Under Neb. Rev. Stat. § 43-365 (Reissue 2016), the equitable division of property is a three-step process. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017).

> The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and determine the marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 43-365.

*Marshall v. Marshall*, 298 Neb. at 16, 902 N.W.2d at 236.

Further, dissolution of marriage cases are equitable in nature, and the purpose of a property division is to distribute the marital assets equitably between the parties. See *Marshall v. Marshall*, *supra*. The ultimate test for determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*. There is no mathematical formula by which property awards can be precisely determined. *Id*. In equity, there is rarely one tidy answer that fits every size and type of problem that courts are called upon to resolve. *Id*.

The option to purchase was acquired by the marital estate when the agreement was signed by both parties in April 2010, and the option remained part of the marital estate at the time of the court-ordered valuation date of December 31, 2014. Even according to Erik, in September 2014, the option was still in full force and effect, and as of December 31 of that year, he had not done anything to jeopardize his rights under the Agreement. The option to purchase was therefore a marital asset at the time of the valuation date. See *Schuman v. Schuman*, 265 Neb. 459, 685 N.W.2d 30 (2003) (as a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule).

As for valuing the option, Samson opined the option had a value of $1,088,061. Samson's report indicates this amount was arrived at by taking the appraised value of the real estate ($1,530,061) and subtracting the adjusted strike price of $442,000. However, Samson acknowledged he was not aware of any cases addressing the method employed to value an option to purchase real estate, nor was he aware of any case in any other jurisdiction addressing the valuation of options to purchase real estate. In his 41-year career, Samson had never prepared a report on an option to purchase real estate "for a court setting." However, we need not decide whether Samson's method of valuation was appropriate because the value of the option is not relevant given our conclusion that the most equitable way to handle the option is to award it to both parties, as discussed next.

Notably, the option to purchase was never exercised either before the parties separated or after, and as Erik asserts, the parties were not in a financial position to exercise the option. As noted previously, in early 2009, Erik and Claire signed a promissory note to Larson for $580,000 and received a joint tenancy warranty deed for her property. However, the parties' attempt to get a loan through Dakota MAC to finance the land purchase was rejected, and they had to deed the land back to Larson. The parties then entered into the Agreement with Larson in April 2010. In November 2013, about a year prior to separation, Erik and Claire attempted to get a $485,000 loan

from Dakota MAC to exercise the option to purchase the property, but their loan was denied. The loan officer testified the loan was denied because of the "overall credit worthiness of the application that we were presented." In September 2014, just before the parties separated, they refinanced their debts and obtained a line of credit for $750,000 (secured by Larson's real estate), which left $400,000 available in that line of credit after paying off the first mortgage and other noted expenses. Nevertheless, there is no evidence the parties attempted to exercise the option to purchase at this point in time or anytime thereafter. Importantly, as part of the refinancing agreement, Erik and Claire were required to subordinate the Agreement; it was subordinate and junior to the lien of the deed of trust securing the refinance loan. It was not until almost 2 years later, on August 1, 2016, that Larson's attorney sent a letter terminating the Agreement as of February 28, 2017; at no time prior to that did the parties attempt to exercise the option since their failed attempt in November 2013. There is no evidence that one party or the other interfered with or frustrated any such attempt to exercise the option.

Accordingly, given the financial circumstances of the parties, we conclude it was an abuse of discretion for the court to award the option to purchase solely to Erik and to assign a value of $1,023,061 to Erik for that option. There was no evidence the parties, either jointly or individually, could have obtained the financing to exercise the option, especially considering the option to purchase was now subordinate and junior to Dakota MAC's lien of the deed of trust securing the refinancing loan. It was also unclear whether the option could be exercised in light of Larson's August 1, 2016, termination letter, or whether Erik or Claire could separately enforce the Agreement since it referred to them as "Erik Holen and Claire Holen, ('Tenant')," and the "Tenant" was granted the option to purchase. A large part of the district court's reasoning for allocating the option to Erik and valuing it at $1,023,061, pertained to the role the court perceived Erik played in Larson's decision to terminate the Agreement. However, as will be discussed in the next section dealing with the district court's jurisdiction over the Agreement, matters related to termination or enforceability of the Agreement were not proper issues for resolution in the divorce action in which Larson was not a party.

Because appeals in domestic relations matters are reviewed de novo on the record, an appellate court is empowered to enter the order which should have been made as reflected by the record. *Schuman v. Schuman, supra*. Accordingly, we conclude that as a matter of equity based on the circumstances described above, as well as for the preservation of any contract rights the parties may still have in the option (despite Larson's termination letter), the option should have been awarded to both parties. Accordingly, we reverse that portion of the decree awarding the option to Erik, and remand with directions to award the option to both parties. Awarding the option to both parties eliminates the need to determine or assign a value to either party for the option. And to the extent the parties are able to coordinate their efforts with the bank and Larson to find a way to still exercise the option, their continued joint interest in the option will make such an occurrence more feasible. Further, if the option is no longer available as a result of Larson's termination letter, that is a consequence that should be borne by both parties unless it can be proved Erik wrongly influenced that outcome. However, as discussed in the next section on jurisdiction, these are issues to be decided in a separate legal action, if it comes to that, with Larson included as a necessary party.

By awarding the option to both parties, another adjustment will have to be made to the district court's property division contained in "Exhibit 'D'" attached to the decree. Specifically, the district court included a "deferred land tax" of $283,558 as a liability associated with the option assigned to Erik. This is the capital gains tax calculated by Samson that would be incurred if the property was sold (assuming the property was held for one year and one day to minimize the tax consequences). Because we have awarded the option to both parties, any tax associated with the sale of the land will also be equally shared by the parties to the extent the option is ever exercised and the property sold. Therefore, this amount is no longer a liability to be listed in the parties' property division and must be deleted as a liability allocated to Erik.

Removing both the value of the option to purchase and the deferred land tax from the property division set forth in the decree, results in a division of assets and debts as follows:

|  | ERIK | CLAIRE |
| --- | --- | --- |
| TOTAL ASSETS | $216,831.00 | $259,978.00 |
| TOTAL LIABILITIES | (524,242.00) | (149,046.00) |
| NET | ($307,411.00) | $110,932.00 |

The revised allocation results in Claire owing an equalization payment of $209,171 to Erik. However, as Erik acknowledges in his brief, Claire has barely enough income to meet her house and car payments, "let alone make a payment towards a judgment of $209,171.00." Brief for appellant at 14. Also, Claire suggests in her brief that approximately $150,000 of the $504,929 Dakota MAC debt attributed to Erik should not be considered marital debt (which would reduce the equalization amount owed to Erik). While it is true Erik testified it was "very possible" he had borrowed another $150,000 between the time of refinancing and December 31, 2014, for farming expenses, attorney fees, and living expenses, Claire did not cross-appeal this issue. Nor did Erik appeal the amount of the Dakota MAC debt allocated to him.

However, it is clear the district court allocated the entirety of the $504,929 debt to Erik because it was also allocating the $1,023,061 option value to him, and this resulted in Erik owing a property equalization amount of $160,580 to Claire. Erik had no reason to appeal the court's determination that $504,929 of the Dakota MAC debt was marital since the higher marital liability resulted in a lower property equalization amount he would owe to Claire. As for Claire, she was awarded a $160,580 property equalization judgment despite testifying on examination from her own attorney that she did not want an equalization (although her responses were confusing on this issue during cross-examination). Claire stated she did not want any of the Dakota MAC debt allocated to her; therefore, the court's allocation of that debt entirely to Erik was her desired outcome. There was no particular reason for her to challenge the amount of debt since it was fully allocated to Erik and she was being awarded a $160,580 equalization judgment despite testifying she did not want one.

Since we are reversing the allocation of the option to be awarded to both parties, we must also reverse the allocation of the debt associated with it. And in doing so, the parties should not be prohibited from raising any challenges to the $504,929 figure used by the district court for the reasons discussed above. Additionally, the equalization judgment in the decree must be reversed. Therefore, we reverse and remand the following matters for the district court's consideration and determination: (1) the amount of the marital portion of the Dakota MAC debt to be included in the

final division of assets and liabilities; whether it should be the balance of the debt as of the September 2014 refinancing ($352,776.11) or the balance at the time of the marital equalization date ($504,929); (2) should the marital portion of the Dakota MAC debt remain allocated solely to Erik or should it be allocated between the parties to eliminate an equalization payout by either party; and (3) is an equalization payment necessary under the circumstances of the case, and if so, is there a reasonable option for how it could be paid given the only asset with equity is the residence awarded to Claire, and possibly the option to purchase the Larson land to the extent the parties elect to and can still pursue that option, as discussed further in the next section.

The district court's consideration of these matters should be based on evidence contained in the trial record, however, it is certainly in the court's discretion to decide whether it would be helpful to schedule a hearing or require briefing for purposes of arguments and proposals from the parties. Further, we want to be clear that nothing in this opinion should be construed to suggest an absolutely equal division of assets and liabilities must be accomplished on remand. Rather, we reiterate the principle that "the division of property is not subject to a precise mathematical formula," and "the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case." *Liming v. Liming*, 272 Neb. 534, 547, 723 N.W.2d 89, 99 (2006).

### (ii) Jurisdiction

For the sake of completeness, and because the district court did make findings and determinations related to Larson's termination letter and the enforceability of the Agreement, we address Erik's argument related to jurisdiction. He contends, "The district court abused its discretion in making findings of fact and conclusions of law with regard to the lease agreement and its termination because the court did not have personal or subject matter jurisdiction with regard to the lease and all of the parties thereto." Brief for appellant at 5 and 18.

In the decree, the district court made several findings related to the option and its termination. The court stated:

> Nowhere in Larson's letter does she cite to any breach of the [Agreement]. There is nothing in the [Agreement] that indicates the landlord has the right to terminate the [Agreement] for the reasons given in Larson's letter.
>
> . . . .
>
> . . . It also does not appear that Larson had a legal basis to terminate the [Agreement] and therefore, [Erik] would have a legal right to enforce the [Agreement].

The court further found that Erik precipitated the termination of the Agreement and that such termination was a sham and the result of Erik violating the non-hypothecation order. Erik argues,

> The validity of the lease with an option to purchase was not an issue raised by the pleadings in the marital dissolution action. Nor was there any pre-trial order identifying that as an issue before the court. Moreover, . . . Larson was not joined as a party to the dissolution action. Not only did the trial court lack subject matter jurisdiction, it lacked personal jurisdiction over the landlord, . . . Larson.

Brief for appellant at 20. Erik cites to *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009), to support his position that the district court lacked jurisdiction because not all necessary parties were joined. He contends Larson was a necessary party to certain matters related to the Agreement. We agree.

In *Reed v. Reed, supra*, the Nebraska Supreme Court stated that the presence of necessary parties is jurisdictional, and the absence of necessary parties deprives a district court of jurisdiction. *Reed* considered whether a husband's parents were necessary parties in the context of the wife's allegations of a fraudulent transfer within the meaning of the Uniform Fraudulent Transfer Act (UFTA). In *Reed*, the husband and wife formed a company to purchase and operate a jewelry store. They obtained bank financing, and the husband's parents agreed to act as sureties on the loans, executing an agreement setting forth each party's rights and obligations. The agreement specified the parents could take title to all of the company's stock if the husband or wife failed to discharge their obligations as owners of the company to the satisfaction of the parents. The parents subsequently paid the bank debt and became the sole financiers of the couple's business. Over the next several years, the couple paid very little toward the principal or interest on the loan, and each conceded that constituted a "default" within the meaning of the agreement with the husband's parents. After the husband informed his father he intended to get a divorce, his parents notified their attorney that they wanted to exercise their option to take title of the couple's company, and letters were sent to the couple informing them that the husband's parents were transferring all shares of the company to themselves. The parents later sold the business, but were unable to sell it for enough money to cover the outstanding debt.

The wife claimed the transfer of company stock was a fraudulent transfer; however, the parents were not made parties to or formally notified of the fraudulent transfer claim. The district court rejected the wife's arguments, reasoning that the couple was in default on their payments to the husband's parents, giving his parents the right to transfer company stock, a secured property pursuant to the financing agreement. Jurisdiction was raised at the appellate level because of the absence of potentially necessary parties.

The Nebraska Supreme Court stated:

> An indispensable or necessary party is one whose interest in the subject matter of the controversy is such that the controversy cannot be finally adjudicated without affecting the necessary party's interest or which is such that not to address the interest of the necessary party would leave the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. A court may determine any controversy between parties before it when it can be done without prejudice to the rights of others or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in. The presence of necessary parties is jurisdictional, and the absence of necessary parties deprives the district court of jurisdiction.
>
> . . . .
>
> Of course, the problem in this case is that [the wife's] fraudulent transfer claims implicate the interests of [the husband's parents] who ended up with the assets that [the wife] claims were fraudulently transferred. Because those interests would be affected if the

transfers were set aside or the assets attached, [the husband's parents] were necessary parties to that extent.

> **But [the wife's] counsel asserted, at oral argument on rehearing, that [the wife] was not seeking to have the transfers set aside; rather, she had only sought to have the *value* of the transferred assets included in the marital estate for purposes of equitable division.** It has been held that if an action is brought for wrongful transfer and it is possible to fashion relief which does not adversely affect the transferee's interest, then the transferee may not need to be joined in an action for judgment of damages against a defendant. And we have held that the determination of one of the parties to a marriage to place property beyond the reach of the other party, and thus forestall a division of the property, does not operate to deprive the district court of jurisdiction to determine an equitable division of those assets--i.e., to award the *value* of a share of the disputed assets.

*Reed v. Reed*, 277 Neb. at 398-400, 763 N.W.2d at 692-94 (emphasis in italics in original, emphasis in bold supplied).

*Reed* goes on to note that because the wife waived any interest in pursuing the dissipated assets (her UFTA claim), the court determined she was not seeking any remedy that was not available to her in a dissolution action as an alleged dissipation of marital assets. And the court determined that the husband's parents were not necessary parties to a claim for dissipation of marital assets.

> To summarize: To the extent that [the wife] sought to set aside the disputed transfers, the trial court lacked jurisdiction because of [the wife's] failure to join necessary parties. But [the wife] now disclaims any interest in setting aside the transfers. So her claim is best characterized as a claim for dissipation of marital assets, which she also presented, and which requires only [the wife] and [the husband] as parties.

*Reed v. Reed*, 277 Neb. at 401-02, 763 N.W.2d at 694-95.

In the present matter, there was no claim of a fraudulent transfer of assets; rather, Claire claimed, and the court concluded, that Erik had encouraged Larson to terminate the Agreement. The district court determined it did "not appear that Larson had a legal basis to terminate the [Agreement] and therefore, [Erik] would have a legal right to enforce the [Agreement]." The court further concluded Larson's termination of the Agreement was "a sham" and was the result of Erik violating the court's non-hypothecation order. However, whether Larson had proper grounds to terminate the Agreement (including whether she was improperly influenced by Erik), and whether Erik could enforce the Agreement against Larson, could not be decided without affecting Larson's interests and rights to her real estate. And as set forth in *Reed v. Reed*, *supra*, a necessary party is one whose interest in the subject matter of the controversy is such that the controversy cannot be finally adjudicated without affecting the necessary party's interest or which is such that not to address the interest of the necessary party would leave the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. And when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in, and the presence of necessary parties is jurisdictional. See *id*. Accordingly, the district court was without jurisdiction to determine the validity of Larson's

termination of the Agreement and Erik's ability to enforce the Agreement without bringing Larson into the action as a necessary party. Those are matters which can be raised by Erik and Claire in a separate action against Larson to the extent they should acquire the financial means and desire to exercise the option, and to the extent further legal action is necessary to resolve their claims.

We likewise do not address the concern raised by Erik as to whether the Agreement's reference to "Tenant" requires both Erik and Claire to exercise the option together or whether the option could be exercised by either of them individually. Again, the resolution of this issue by a court requires the inclusion of Larson as a necessary party in a legal proceeding. For the same reason, we do not address Erik's arguments about the language in paragraph 2 of the Agreement which states the Agreement "may be terminated by either party upon notice in writing on or before September 1 for the next year." Claire argues paragraph 2 applies only to the lease and not the option to purchase. However, once again, this presents an issue of contract affecting Larson's interests which cannot be determined in these divorce proceedings, since Larson is not a party.

Accordingly, all findings and conclusions made by the district court in the decree related to Larson's motivations and decision to terminate the Agreement and Erik's (and/or Claire's) ability to enforce the Agreement are reversed and vacated.

## 2. Money Removed After Valuation Date

Erik argues the court erred when it failed to require Claire to account for $23,373.42 removed from the Home Federal account (funded by the Dakota MAC revolving credit line) after the court-ordered dated of valuation.

Claire acknowledged that on November 19, 2015, she withdrew $20,000 from a Home Federal commercial checking account, and a check was issued by the bank to her attorney's office. She also acknowledged a November 20 "EPAY" of $3,373.42 from that checking account to her credit card.

In the decree, the district court noted Claire's use of the Home Federal funds to pay her attorney, and cited that as one reason Claire would not receive "additional attorney's fees." Accordingly, the district court did not ignore Claire's removal of funds and we find no abuse of discretion in its handling thereof.

## 3. Custody

### (a) Physical Custody and Parenting Time

The district court awarded physical custody of the parties' children to Claire, subject to Erik's specified parenting time. Erik's parenting time includes every other weekend from 3:30 p.m. on Friday until 8 a.m. on Monday; midweek parenting time every Monday from 3:30 p.m. to 7:30 p.m. when Claire works, and "if [Claire] works a second weekday evening each week, then [Erik] shall have the children from 3:30 - 7:30 p.m. that evening too"; 4 weeks every summer; and 4 weeks every winter commencing with his second weekend of parenting time in January.

Erik argues the district court erred when it failed to award joint physical custody to both parties or, in the alternative, to adopt Dr. John Meidlinger's recommended parenting time plan.

Dr. Meidlinger, a certified clinical psychologist, conducted a custody evaluation in this case. The parties stipulated to the admissibility of his deposition and report (exhibit 43) in lieu of his testimony at trial. Dr. Meidlinger stated both Erik and Claire are good parents, and he

recommended they share joint legal custody. However, Dr. Meidlinger believed "it would be better to have Claire be the primary physical custodian of the children at this time." He believed "Claire is better equipped at managing the children's day-to-day life." He noted under the temporary order, Erik had parenting time every other weekend (from Friday at 3:30 p.m. to Sunday at 5 p.m.) and two evenings each week (Mondays from 4 to 8 p.m., and Thursdays from 5 to 8 p.m.). Dr. Meidlinger recommended Erik continue to have those two evenings of parenting time, and that one of those evenings be an overnight on the Thursday after his weekend parenting time. Dr. Meidlinger also recommended Erik have one month of parenting time during the summer and one month of parenting time during the winter (under the temporary order Erik was getting 4 weeks of parenting time during only the summer).

Erik testified he was "very active in [the children's] full day schedule from the time they were born," and believed he had taken on 50-percent of the responsibilities related to the children. But he later acknowledged he was the primary bread winner and Claire was the primary caretaker. Erik asked the court to award joint physical custody, stating, "[A]ll I've ever wanted was equal, to share our children. They're our children." His proposed parenting plan (exhibit 117) was for the parties to have alternating weekly parenting time with exchanges occurring on Sundays at 7 p.m., and for the children to spend Wednesday evenings from 5 to 8 p.m. with the parent who is not exercising parenting time that week.

Claire testified she was the primary caretaker of the parties' three children during the marriage. For the first 3 or 4 years of farming, Erik "would be gone very early in the morning and I wouldn't get to see him again until later in the day, much later in the day. Like I'd feed the kids and put them to bed and wait to have dinner with him when he got home." She said Erik did have more flexibility and spent more time at home when it was not planting or harvest season, but he still frequently left home early in the morning and came home after the children were in bed or came home to kiss them good night. Claire is the one who organizes the children's play dates. She takes the children to their medical and dental appointments. She is also the one who attends to their religious development by taking them to church services, Sunday school, and Wednesday evening programs. She did acknowledge that she and Erik go to parent/teacher conferences together.

Claire stated she loves her children and they love her, and Erik loves the children and they love him. She agreed it would be appropriate for the parties to share joint legal custody. However, Claire did not believe joint physical custody, as requested by Erik, was in the children's best interests because "they have an established comfortable routine and environment" and she is "best suited" to handle their needs. Furthermore, the children "have dealt with a lot of different transitions over the past two years, and [trading living arrangements every week] would be traumatic." Her proposed parenting plan (exhibit 108) was for Erik to have parenting time every other weekend from Friday at 3:30 p.m. to Sunday at 5 p.m., and Mondays from 3:30 to 7:30 p.m. (to accommodate bedtime). She also proposed each parent receive two weeks of extended summer parenting time.

Each party had witnesses testify on his or her behalf. Erik's sister-in-law and a long-time family friend testified Erik is "a great dad . . . a loving dad," and is involved with his children. Claire's mother and two of Claire's friends described Claire as a very involved mother, "extremely competent," and very loving. One of Claire's friends testified she has been present at Claire's home

when the children have returned from parenting time with Erik; upon return the children are "out of sorts," "acting up," and "off their schedule."

Keeping the evidence and the court's findings in mind, we now consider the legal principles governing custody and parenting time matters. When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). The best interests inquiry has its foundation in both statutory and case law.

Neb. Rev. Stat. 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Based on the evidence, the court's findings, and the foregoing legal principles, we cannot say the district court abused its discretion in awarding physical custody to Claire. Similarly, we cannot say the district court abused its discretion in its award of parenting time to Erik. There is one difference between the decree and Dr. Meidlinger's recommendation: pursuant to the decree, Erik gets parenting time a second weekday evening from 3:30 to 7:30 p.m. if Claire works a second weekday evening; whereas, Dr. Meidlinger recommended that Erik have two evenings of parenting time each week, and that one of those evenings be an overnight on the Thursday after his weekend parenting time. The district court's decision not to follow Dr. Meidlinger's recommendation in that regard was not an abuse of discretion.

Erik points out that the court's parenting plan creates different midweek parenting time allowances for him and Claire. The parenting plan provides that when Claire has midweek parenting time, she is to have such time two evenings from 3:30 to 7:30 p.m. He "submits that at a minimum, his mid-week [parenting time] should replicate [Claire's] mid-week [parenting time]." Brief for appellant at 26. However, Claire will only have midweek parenting time during the limited times when Erik has the children for a full week, which will only happen for a short time during the summer, a short time during the winter, and during an occasional holiday parenting

time. Accordingly, we cannot say the district court abused its discretion when it awarded Erik a second midweek evening of parenting time only if Claire works a second weekday evening.

### (b) Right of First Refusal for Daycare

Erik argues the district court erred when it failed to award him the first right of refusal for daycare. Claire points out that the district court did grant Erik a second evening of parenting time if she is working, and that "[t]his is essentially a right of first refusal[.]" Brief for appellee at 35.

The decree and parenting plan are silent regarding the first right of refusal. However, the issue was raised at the hearing on the parties' motions for new trial or to alter or amend the judgment. At the hearing, Claire's counsel said she would not oppose a right of first refusal with respect to daycare, but the children do not really go to daycare and she would not want to see either party obligated to call the other for some short amount of time (e.g. when Claire takes the children to the YMCA childcare center while she works out for an hour). The district court did not alter or amend its judgment to include a right of first refusal. After our de novo review of the record, we cannot say the district court abused its discretion in failing to award Erik the first right of refusal for daycare.

### 4. CHILD SUPPORT AND ALIMONY

Erik claims the district court abused its discretion by failing to use Claire's earning capacity when determining child support and by failing to annualize his monthly child support obligation. On cross-appeal, Claire assigns error to the district court for failing to average Erik's income for purposes of child support and alimony, and for capping Erik's reimbursement for daycare and medical expenses at $113 per month.

### (a) Each Party's Income

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). The guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." *Freeman v. Groskopf*, 286 Neb. at 721, 838 N.W.2d at 307. See, also, Neb. Ct. R. § 4-204 (rev. 2016). Use of earning capacity to calculate child support is useful "when it appears that the parent is capable of earning more income than is presently being earned." *Freeman v. Groskopf*, 286 Neb. at 721, 838 N.W.2d at 307.

### (i) Claire's Income

Erik argues the district court erred by failing to use Claire's earning capacity when determining child support. He points out that in the past Claire has earned as much as $65,000 per year. And he "submits that [her] earning capacity is at least equal to or greater than his earning capacity." Brief for appellant at 27.

It is true Claire earned $65,000 per year when she worked for Club Assist, as their marketing manager for North America. However, Claire became a stay-at-home mother in the summer of 2009, in part because her position at Club Assist was being relocated to Los Angeles and would have required her to move, and in part because it was more important for her to stay at

home with their premature son. She did not work outside of the home again until shortly before the divorce proceedings were filed, when she obtained a part-time job at the YMCA earning $11 per hour. She works every Monday night from 4 to 8 p.m., and had taken on Thursday evenings from 5 to 8 p.m. when Erik had the children. She also made herself available to work weekends when the children were with Erik; if scheduled to work weekends, the shifts are for 5 hours.

Since February 2016, she has also done some marketing consulting work for NorthStar Battery; she works from home and the hours she works are project dependent. She has received only one payment from NorthStar Battery; a total of $4,000 on April 30, which covered three projects. At the time of trial, she was working on another project for NorthStar Battery, and had accrued a total of 20 hours since May, at a rate of $40 per hour. Claire has an opportunity for a full-time position at NorthStar Battery, but would have to relocate to Springfield, Missouri; something she is not trying to do at this point.

Even though Claire does not work full-time, she stated she was a "physically able person," and agreed she was capable of earning $10.25 an hour at a full-time job (the approximate earning capacity attributed to her in the temporary child support order). Claire was asked if she believed she was earning as much as she could without incurring daycare expenses, and she replied, "Yes." If she has to get a full-time job, she would seek employment elsewhere because when she recently looked online, there was nothing she "could apply [her] skill set to" in Holdrege or Kearney, Nebraska; she "would imagine" that Lincoln, Nebraska, or Omaha, Nebraska, would have "more corporate level" businesses that she could "fit into."

In its calculation of child support in the decree, the court used an income of $11 per hour for a 40-hour work week for Claire. The court stated "[a]lthough [she] occasionally has part-time income which pays more than $11.00 per hour, it is not income that is available to her on a regular or full-time basis and therefore, given her current circumstances, the Court finds her earning capacity to be $11.00 per hour." Accordingly, the district court determined Claire's total income was $1,907 per month, which equates to $22,884 per year. Having reviewed the record, we find no abuse of discretion in the district court's decision to use an income of $11 per hour for a 40-hour work week for Claire.

### (ii) Erik's Income

Claire argues on cross-appeal that the district court erred by not averaging Erik's income for purposes of child support and alimony because "he had substantial fluctuations in income." Brief for appellee on cross-appeal at 40. She also points out that in Erik's support calculation (exhibit 129), he put his income at $4,177 per month.

Claire is correct that Erik represented his income as $4,177 per month in exhibit 129; this equates to $50,124 per year. At trial, while offering this exhibit into evidence, Erik's counsel said "the Court can figure out how I attributed income to the parties." However, we have not been able to determine how Erik's counsel came up with that income for Erik. We have tried averaging income for periods of 4, 5, and 6 years, and cannot get an income anywhere close to $50,000 per year. In fact, all of our calculations have resulted in an income lower than the $35,365 yearly income used by the district court, as discussed below.

Because Claire did not work outside of the home after the summer of 2009, until late summer 2016, income information from the parties' tax returns from 2010 to 2015 would be

wholly attributed to Erik. Tax returns received into evidence show that in 2010, the parties' total income (not adjusted gross income) was $32,229; this included $23,520 in net farm income, $2,360 in "rents received," and $6,349 from other wages. In 2011, the parties' total income was $32,304, which consisted entirely of net farm income. In 2012, the parties' total income was $141,278; this included $118,927 in net farm income and $22,351 from other wages. In 2013, the parties' total income was $136,900; this included $97,779 in net farm income and $39,121 from other wages. In 2014, there was a negative total income of $21,278; this included a net farm loss of $62,329, $19,804 from other wages, $10,025 from the sale of business property (a pickup truck), and $11,222 from an IRA distribution. In 2015, there was a negative total income of $149,547; this included a net farm loss of $117,121, a carryforward net operating loss from farming operations in 2014 of $42,183, $9,692 from other wages, and a $65 taxable "refunds, credits, or offsets of state and local income taxes."

As discussed previously in this opinion, Larson sent a letter dated August 1, 2016, terminating the parties' lease agreement. And Erik testified he had been notified he would not be farming Larson's land the next year. He discussed his other sources of income as well. Erik worked as a mortgage broker in Holdrege; he started sometime in 2014, but in June 2015 the company did not renew his contract because he was not meeting performance expectations. He was also a seed dealer for NuTech, but was only a dealer to "get the discount," and he never sold seed to anyone but himself. At the time of trial, Erik was also doing seasonal work (spraying and harvesting) for someone else making $17 per hour, but the work was "as needed" and not a set 40 hours per week.

In its calculation of child support in the decree, the court used an income of $17 per hour for a 40-hour work week for Erik. The court stated it "is aware that [Erik's] income at the time of the temporary hearing was calculated to be much higher than the figure used by the Court." But, "[t]hat figure included farm income from profitable years[,]" and "[c]ircumstances have changed and [Erik] indicated that he will be working as a farm laborer for $17.00 per hour." Accordingly, the district court determined Erik's total income was $2,947 per month, which equates to $35,365 per year. Having reviewed the record, we find no abuse of discretion in the district court's decision to use an income of $17 per hour for a 40-hour work week for Erik.

(b) Annualizing Monthly Child Support Obligation

Erik was ordered to pay $686 per month in child support, but child support "shall abate by 50% during the months of June and January each year commencing in 2017." Erik argues the district court erred by failing to annualize the monthly child support obligation. He "submits[s] that the trial court should annualize any child support abatement permitting future equal wage withholding, if applicable, or equal monthly automatic electronic child support deposits." Brief for appellant at 27. While it would certainly make the automatic withholding more convenient to have the same amount owed each month as Erik asserts, we cannot say the district court's unwillingness to annualize the June and January abatements constitutes an abuse of discretion by the court in this regard. See Neb. Ct. R. § 4-210 (rev. 2008) (adjustment in child support may be made at discretion of court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period.)

### (c) Reimbursement for Daycare and Medical Expenses

The district court ordered Erik to be responsible for 59-percent of any employment or education-related daycare expenses for the minor children. Erik was also ordered to pay 59-percent of unreimbursed medical, dental, and optical expenses for the minor children after Claire pays the first $480 per child per year. However, the decree states, "The total daycare and/or unreimbursed medical expenses may not exceed $113.00 per month due to the poverty guidelines."

Claire argues on cross-appeal that the district court erred when it capped Erik's reimbursement for daycare and medical expenses at $113 per month. She claims "the Court should instead order simply that 'Payment of medical expenses and day care expenses may not place Erik below the minimum subsistence level in any given month,'" otherwise she would have the burden of requesting a formal modification every time there is a change in the federal subsistence level. Brief of appellee on cross-appeal at 43.

Neb. Ct. R. § 4-218 (rev. 2016) provides for a basic subsistence limitation and states in relevant part, "A parent's support, child care, and health care obligation shall not reduce his or her net income below the minimum of $990 net monthly for one person, or the poverty guidelines updated annually in the Federal Register[.]" Although the district court did not provide details on how it arrived at the $113 per month cap on child care and medical expenses, the amount is consistent with the figures contained on the child support worksheet. Erik's monthly net income is $2,247 after taxes and his own health insurance premium. If we subtract the cost for the children's health insurance premium ($458) and his child support obligation ($686), he is left with income of $1,103 per month. Subtracting the 2016 basic subsistence amount of $990 leaves only $113 available for child care and medical costs as set forth in § 4-218. There was certainly no error in the district court's decision to cap these costs in accordance with the restrictions contained in § 4-218.

Claire's argument that she would have the burden of requesting a formal modification every time there is a change in the federal subsistence level is curious, since historically, annual adjustments to the basic subsistence level have increased. Thus, assuming no change in Erik's income, an increase in the basic subsistence level would further reduce the cap on Erik's contributions to child care and medical costs. Nevertheless, to avoid either party from having to seek modification of this provision from year-to-year as the federal poverty basic subsistence level changes, we modify the decree to add the following italicized language to the current language as noted:

> The total daycare and/or unreimbursed medical expenses may not exceed $113.00 per month due to the poverty guidelines. *This monthly cap shall be recalculated by the parties annually if requested by either party, if, and after, the Nebraska Child Support Guidelines are amended to reflect a change in the federal basic subsistence level set forth in Neb. Ct. R. § 4-218.*

### (d) Alimony

Claire argues the circumstances in this case justify an award of alimony, and she is requesting that support continue for two years, or until the parties' youngest child enters kindergarten in the fall of 2018.

In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). See, also, Neb. Rev. Stat. § 42-365 (Reissue 2016). In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities. *Brozek v. Brozek, supra*.

The testimony at trial reveals Claire gave up her position with Club Assist, where she earned $65,000 per year, to stay in the Holdrege area and to be a stay-at-home mother to the parties' children. Claire testified she plans to stay in Holdrege if she has the "financial stability" to do so. However, if she has to get a full-time job, she would seek employment elsewhere because when she recently looked online, there was nothing she "could apply [her] skill set to" in Holdrege or Kearney; she "would imagine" that Lincoln or Omaha would have "more corporate level" businesses that she could "fit into."

Claire testified that even with the temporary alimony and Erik's payment of the mortgage, she has had to get supplemental help from her parents. She needs alimony to be able to continue to provide for the children and stay in the area. Exhibit 97 is a summary of Claire's monthly living expenses, and presumes that she will keep the house and pay the mortgage. According to the exhibit, her monthly expenses total $4,806.54, which includes expenses such as $1,113.54 for the mortgage, property taxes, and home owner's insurance, $442 for "City of Holdrege" utilities, $125 for "source gas," a $500 car payment, and $300 for attorney fees.

Claire anticipated an inheritance from her father, who had recently passed away in May 2016. She said, "it was explained to me that I would inherit somewhere in the realm of $400,000," but she did not know when the generation skipping trust would be funded. Later testimony indicated the trust might be funded in a spendthrift trust, which would have restrictions on how it could be used.

Erik's income and employment history has been previously discussed in this opinion. Exhibit 123 is an estimate of Erik's monthly living expenses totaling $4,699.

Claire had been receiving temporary alimony of $1,250 per month since December 2014. In its decree, the court stated, "The dilemma in this case is that although the Court may be inclined to award [Claire] alimony for some additional period of time, [Erik] simply does not have the income to sustain the award." The court did later amend the decree to award Claire alimony of $1 per year for 3 years. After a de novo review of the record and considering the circumstances of this case, we conclude the court's award of nominal alimony was not an abuse of discretion.

5. HEALTH INSURANCE

Erik claims the district court abused its discretion by failing to order both parties to provide health insurance for the minor children. The district court ordered only Erik to "provide, maintain and pay for health insurance coverage on said minor children as long as it is available to him through his employer, with the same deductible and the same coverage as that currently in force," until the children reach 19 years of age, are no longer eligible for coverage under Erik's insurance plan, or until further order of the Court, whichever occurs first. The court also ordered both parties

to inform the Clerk of the District Court when they have obtained access to employer-related health insurance.

At the time of trial, neither party had health insurance coverage available through their respective employers. However, Erik was paying for an insurance policy with family coverage. He argues the district court should have entered "a prospective order" requiring both parties to provide, maintain, and pay for health insurance coverage on the minor children as long as it is available to them through their respective employers. While Erik's suggestion is reasonable, we cannot say the district court abused its discretion by ordering Erik to be responsible for the children's health insurance coverage since at the time of trial Claire was only working part time and such coverage was not available to her.

We note in his brief Erik argues but does not assign error to the sufficiency of the evidence regarding Claire's health insurance premium (for which she received a deduction on the child support calculation). However, to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Waldron v. Roark*, 298 Neb. 26, 902 N.W.2d 204 (2017). We therefore do not address this argument.

### 6. ATTORNEY FEES

Claire argues on cross-appeal that the district court erred in failing to award her attorney fees, "particularly if the decision with respect to the Home Federal advance is reversed." Brief for appellee on cross-appeal at 44.

In awarding such fees, a court should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

Claire's attorney's affidavit in support of fees, with copies of bills attached, was admitted into evidence. The affidavit shows that as of August 23, 2016, Claire had incurred $42,964.37 in attorney fees and expenses (this does not include appraisal and valuation expert fees), with an additional $8,850 in additional attorney fees anticipated for trial preparation and trial. Pursuant to the temporary order in December 2014, Erik was ordered pay attorney fees of $3,500 and expert witness fees of $5,000. Claire asked the court to award her some amount of additional attorney fees.

As discussed previously in our opinion, Claire acknowledged at trial that on November 19, 2015, she withdrew $20,000 from a Home Federal commercial checking account, and that a check was issued by the bank to her attorney's office. In the decree, the district court noted Claire's use of the Home Federal funds to pay her attorney, and cited that as one reason Claire would not receive "additional attorney's fees." We find no abuse of discretion in the district court's decision to not award attorney fees.

### VI. CONCLUSION

We reverse the portion of the decree which awards the option to purchase to Erik, and remand with directions to award the option to purchase to both parties and to reconfigure the final

- 24 -

division of marital assets, liabilities, and equalization as discussed herein. We also reverse and vacate all portions (findings and conclusions) of the decree addressing the motivations for, and the validity of, Larson's termination letter, as well as those portions of the decree addressing the enforceability of the Agreement. We modify the language capping Erik's contributions to child care and medical costs as set forth herein. In all other respects, we affirm the district court's decree.

AFFIRMED IN PART, AFFIRMED IN PART AS MODIFIED, REVERSED AND REMANDED IN PART WITH DIRECTIONS, AND IN PART REVERSED AND VACATED.